Billy MASH, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2010–SC–000584–MR.

Supreme Court of Kentucky.

March 22, 2012.

Rehearing Denied Sept. 20, 2012.

Thomas More Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General, James Coleman Shackelford, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, for appellee.

Opinion of the Court by Justice NOBLE.

Appellant Billy C. Mash was convicted in McCracken Circuit Court of one count of first-degree sodomy. He was sentenced to twenty years' imprisonment. Appellant now challenges his conviction before this Court as a matter of right. Ky. Const. § 110(2)(b). This Court affirms.

## I. Background

This case involves a sexual assault committed by one inmate against another in the McCracken County Jail. On January 1, 2009, Appellant was incarcerated in the jail. The victim in this case, Matthew Morgan, was arrested in the early morning hours of New Year's Day and brought to the same cell block of the jail in which Appellant was housed. Appellant, an African–American man in his fifties, and Morgan, a nineteen-year-old white man, shared a cell for the next few days. According to Morgan, Appellant pressured him to have sex on his second night in jail, but Morgan refused. Morgan was so frightened he could not sleep that night. On Morgan's third night in jail, Appellant pulled him off the top bunk, pinned him down, and put his hands on Morgan's throat. Appellant put his penis in Morgan's mouth, then in his anus, and then in his mouth again.

The next morning, another inmate reported the attack to jail personnel. Morgan was transported to a local hospital, where a Sexual Assault Nurse Examiner ("SANE nurse") performed an examination. The SANE nurse swabbed both the inside and outside of Morgan's anus. A lab technician later determined that a sample taken from Morgan's anus contained sperm cells matching Appellant's DNA, although the lab technician did not specify at trial whether the matching DNA was found inside or outside Morgan's anus. The examination by the SANE nurse also revealed marks on Morgan's neck consistent with someone gripping his neck, some redness on his right buttock, and injuries to his shins, but the nurse did not document any tears or trauma to the anus.

When interviewed by jail personnel and a detective, Appellant at first denied that he had had any sexual contact with Morgan. Later, he explained that there had been some sexual contact between them, but that it had been consensual. According to Appellant, he and Morgan became friends during the time they were in jail together. On the third night Morgan spent in jail, again according to Appellant, Morgan masturbated Appellant to express gratitude to Appellant for looking out for him. Appellant characterized this encounter as Morgan willingly giving him a "hand job."

Appellant was charged with two counts of sodomy in the first degree and with being a persistent felony offender in the first degree. The jury instructions differentiated between the two sodomy counts, with one asking the jury to find that Appellant "penetrat[ed] Morgan's anus with

his penis" by forcible compulsion, and the other that Appellant "penetrat[ed] Morgan's mouth with his penis" by forcible compulsion. Appellant was found guilty under the instruction for anal sodomy but not guilty under the instruction for oral sodomy. He was sentenced to twenty years' imprisonment.

## II. Analysis

### A. Fair Cross–Section Challenge to the Jury Panel.

■ Appellant argues that the trial court erred by denying his motion to set aside the jury panel and set a new trial. He argues the panel did not represent a fair cross-section of the community because there was only one African American on the panel. For the reasons explained below, Appellant did not establish a prima facie violation of the fair cross-section requirement, and therefore the trial court did not err.

From the start of the proceedings, Appellant believed that he would not get a fair trial in McCracken County because of his race. At a hearing on his motion for change of venue,[1] Appellant argued that the fact that he was a middle-aged African–American man and the victim was a nineteen-year-old white man would prejudice a white jury against him. Appellant told the court that he had been tried seven times in McCracken County, and he stated, "[T]here's been one black in each, in each case. So every jury's been white." Appellant's motion for change of venue was eventually withdrawn because defense counsel could not find anyone to sign the affidavits required by KRS 452.220(2).

Appellant raised the issue of racial composition of the jury during a hearing in the judge's chambers the morning of trial before voir dire. At that point, the jury panel was starting to come into the courtroom but not everyone had arrived yet. Defense counsel noted that she had only seen one African American on the panel so far. She argued: "I just want to call the court's attention to the fact that I think that ... this may not be a good representation of minorities on that panel. That this panel may be flawed in some manner." The prosecutor responded that the method of sending jury summons in McCracken County was absolutely race-neutral. The court did not rule on the issue at that time. Ultimately, only one African American was on the panel of 42 potential jurors. Eight or nine other potential jurors were supposed to show up that day but never did; their races are unknown. After voir dire, defense counsel made a motion to set aside the jury panel and to set a new trial date. The court denied the motion.[2]

---

1. Appellant's motion for change of venue gave two reasons why the change was necessary: the charge was a sex crime that would be publicized, and the victim's parents (a preacher and a nurse) were well-respected in the community. At the hearing on the motion, Appellant testified and, for the first time, brought up the issue of race. The issues regarding publicity and the victim's parents were apparently dropped once the motion was withdrawn, and Appellant does not now make any claims about those grounds for a change of venue.

2. The Commonwealth argues that Appellant's fair cross-section claim was not properly preserved because Appellant did not move to set aside the jury panel until after voir dire. RCr 9.34 requires that any objection based on a flawed summoning process be raised before juror examination.

However, defense counsel at least raised the issue to the court before voir dire began, even though she did not make a formal motion and the court did not rule on the issue at that time. This Court concludes that defense counsel substantially complied with RCr 9.34 by raising the issue with the court before voir dire, and so it is appropriate to consider the merits of this issue.

■ To succeed on a challenge to the racial composition of the jury panel, a defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The burden is on the defendant to make this showing. *Johnson v. Commonwealth*, 292 S.W.3d 889, 894 (Ky.2009). "It is not enough to merely allege a particular jury failed to represent the community." *Miller v. Commonwealth*, — S.W.3d —, —, 2011 WL 6543054 (Ky.2011). Although the first prong of the *Duren* test is met in this case because African Americans constitute a distinctive group in the community, *see Rodgers v. Commonwealth*, 285 S.W.3d 740, 759 (Ky. 2009), Appellant failed to meet the second and third prong because he did not provide any information to the trial court about the number of African Americans in McCracken County or establish that there had been systematic exclusion of the group in the jury selection process.

■ The second prong of the test requires data about the number of members of the excluded group in the community. In his brief, Appellant cites to the 2000 United States census to show that 11.4% of the McCracken County population is African American alone or in combination with one or more other races. The census information was not provided to the trial court, but Appellant now asks this Court to take judicial notice of this information. While census information is the type of fact that may be judicially noticed under KRE 201, appellate courts should use judi-cial notice only "cautiously," and this Court declines to do so in this case. *Commonwealth, Cabinet for Health and Family Services v. Ivy*, 353 S.W.3d 324, 335 (Ky. 2011). Judicial notice "should not be used as a device to correct on appeal a failure to present adequate evidence to the trial court." 1 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 201.32[3][a] (2d ed.2003); see Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.00[5][d] (4th ed.2003) (explaining that judicial notice should be used "sparingly" on appeal). Here, Appellant failed to provide the trial court with any information about the number of African Americans in McCracken County at the time when the objection to the jury panel was made the morning of trial. Without this information, it was impossible for the trial court to evaluate whether Appellant had satisfied the second prong of the *Duren* test, and therefore Appellant failed to meet his burden.

Even if this Court were to take judicial notice of the census information showing the number of African Americans in McCracken County, Appellant still has not provided enough information to meet his burden under the second and third prongs of *Duren*. This Court has held that mere citation to census data, without any other information, is not enough to show underrepresentation or systematic exclusion. *Miller*, — S.W.3d at — (holding that defendant had not established that African Americans were unreasonably underrepresented when his only evidence on the issue was a reference to the 2010 U.S. Census); *Johnson*, 292 S.W.3d at 895.

■ A defendant may demonstrate systematic exclusion by providing statistical information showing that a particular group was underrepresented in a county's jury panels *over a period of time*. *Duren*, 439 U.S. at 366–67, 99 S.Ct. 664 (defendant

met his burden by showing that women were underrepresented "in every weekly venire for a period of nearly a year"). Alternately, a defendant may show that something about the way a county selects its jury panels or creates its master list of jurors leads to systematic exclusion of a particular group. *See Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (defendant made a prima facie showing of discrimination by demonstrating that the jury commissioner had used white tickets for white jurors' names and yellow tickets for African American jurors' names during the selection process, and the jury panel that was supposedly randomly selected was all-white despite a significant number of available African American jurors). Neither showing was made in this case.

In his brief, Appellant relies heavily on a statement he made to the trial court during a pretrial hearing: "I done had seven jury trials in this county, and there's been one black in each, in each case. So every jury's been white." Appellant argues that this statement shows that there is consistent underrepresentation of African Americans in McCracken County jury panels. Appellant made this statement during a pretrial hearing several months before trial, not during the discussion in chambers just before voir dire when defense counsel first challenged the composition of the jury panel. Although the trial court had heard Appellant make the statement several months before, the information was not repeated to the court or brought to the court's attention in any way at the time when the court was considering Appellant's motion to set aside the jury panel.

■ The statement is also ambiguous—Appellant states that "there's been one black in each, in each case" but that "every jury's been white." The statement does not indicate when Appellant's trials took place, so it is of little help to a court in evaluating whether racial imbalance is a consistent problem in the county's jury panels. Moreover, the statement appears to refer to the jurors who actually sat on Appellant's trials, not the jury panels. Defendants are entitled to a jury selected from a fair cross-section of the community, but they "are not entitled to a jury of any particular composition." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) ("[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."). A statement like that made by Appellant, standing alone, is insufficient to make the showing required by *Duren* because it went only to his experience and is not a claim about the overall jury-pool selection process.

In this case, the only evidence presented to the trial court on this issue was that there was one African American out of 42 potential jurors on the jury panel for Appellant's trial. Appellant provided no context for that number; he did not provide information about the number of African Americans in McCracken County, he did not provide comparison information about the racial composition of other jury panels in the county, and he did not identify anything about the process for summoning jurors that would suggest racial imbalance. The bare "one out of 42" statistic, even when considered in conjunction with the census data that was not presented to the trial court, is simply not enough to demonstrate unreasonable underrepresentation or systematic exclusion.

**B.** *Batson* **Motion.**

■ Appellant also argues that the trial court erred by allowing the Commonwealth to use a peremptory strike against the one African–American juror on the panel, Juror 73. For the reasons ex-

plained below, the trial court conducted the proper analysis under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and this Court will not disturb the trial court's decision because it was not clearly erroneous.

The *Batson* issue in this case stems from the prosecutor's observation of Juror 73 during the defense counsel's voir dire of the panel. Near the end of voir dire, defense counsel asked several questions regarding race relations. She asked whether anyone on the jury panel had any problem with or reaction to the fact that the case involved a black defendant and a white victim. No one responded verbally, and so she moved on to her last few questions and finished her voir dire of the panel. The trial court released the jury panel to take a break while the parties compiled their peremptory strikes. At that point, the prosecutor brought up the possible *Batson* issue, and the following exchange between the prosecutor and defense counsel took place:

> Prosecutor: We might as well get this out here before we start doing strikes. I had not intended to strike [Juror 73], the one and only African–American juror. But when [defense counsel] began her questioning about does anyone have any problem with a black [defendant] and a white victim, I noticeably saw her sit up in her chair and do this [crossing arms] and got angry about it. She hasn't uncrossed her arms yet. She's been looking over there at Mr. Mash and she's been looking over there at [defense counsel] and I'm going to strike her and I think I'm doing this on a completely race-neutral reason, but that's where I'm going with it.

> Defense: She is the only black juror and I didn't notice anything. I didn't no-

tice anything and body language is not something that you can just—

> Prosecutor: I have been watching that lady from the minute she came into the courtroom. She sits right in front of my table. She's very easy for me to recognize and watch, along with all the other jurors. She was totally relaxed and going along and the minute [defense counsel] did that, and the minute this became a black man accused of doing this horrible thing to a white man, I just watched a hundred-and-eighty degree turn around in her attitude.

> Defense: She might be mad, she might be mad at me for just bringing up race in general.

> Prosecutor: Nope, I watched it. I'm not a fool, I watched exactly what happened.

> Defense: Because she's the only black person on there ... [inaudible] ... because it's a black man. So she might be mad at me for even bringing the race card up—which I had to.

> Prosecutor: I'm telling you what I saw and I'm telling you what I know and I'm telling you what my instincts strongly tell me and I intend to strike this lady and if we've got a *Batson* problem, we might as well deal with it now. It either is a race-neutral reason or it isn't.

> Defense:—may be a race-neutral reason but I don't think, you know, that it necessarily means that she is inclined to them. I think it would be more so inclined against us.

> Prosecutor: Honest to goodness, in good faith, here's my strike sheet [showing the court his strike sheet]. I never had any intention of striking [Juror 73]. And the thing didn't pop up until [defense counsel] got there with that series of questions.

The trial judge said that he had not noticed any reaction by the juror. Defense counsel said that he had not seen anything unusual about the juror but noted that she had not been looking at her during the relevant questions. The trial judge said, "I'm going to find there's a race-neutral basis for the striking. . . . Mr. Harris [the prosecutor] has been practicing in this court for a long time. I feel confident he wouldn't just strike a minority for no reason." When defense counsel again raised her *Batson* objection just before the jury was sworn, the judge said that he was confident that the prosecutor would not make up a pretext to excuse a minority juror, particularly in a case that could be racially charged.

Both parties now argue that the video recording of voir dire supports their side, with the defense arguing that the video shows no reaction by Juror 73 at the point when defense counsel asks the race questions, and the Commonwealth arguing that it shows her turning her head and moving her arms at the critical moment. After careful review of the full video recording and the excerpt provided by the Commonwealth, the Court concludes that it does not support either side because the camera angle and poor video quality make it difficult to see the juror's facial expressions or movements.

■ Under *Batson*, claims of racial discrimination in the use of peremptory strikes are analyzed under a three-step test. "First, the defendant must show a prima facie case of racial discrimination. If the trial court is satisfied with the defendant's showing, the burden shifts to the prosecutor to state race-neutral reasons for the peremptory strikes. The trial court must then determine whether the defendant has sufficiently proven purposeful discrimination." *Thomas v. Commonwealth*, 153 S.W.3d 772, 777 (Ky.2004) (cit-ing *Batson*, 476 U.S. at 93–98, 106 S.Ct. 1712). A trial court's denial of a *Batson* challenge is reviewed for clear error. *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky.2000).

In this case, there is no need to determine whether a prima facie showing of discrimination was made under the first *Batson* prong because the prosecutor volunteered an explanation for his strike. *Commonwealth v. Snodgrass*, 831 S.W.2d 176, 179 (Ky.1992) (citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)) ("[S]ince the prosecutor offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate issue of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing . . . becomes moot.").

■ The second *Batson* step, whether the prosecutor stated a race-neutral basis for the strike, was met in this case. This step sets a fairly low bar for the Commonwealth to meet. "[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859. The prosecutor's stated reason for the strike was that he believed Juror 73's strongly negative reaction to the defense counsel's questions about the races of the defendant and victim showed that she could not be a neutral juror. On its face, this reason is race-neutral because it could apply with equal force to a juror of any race. Thus, the second *Batson* step is met.

■ At the third step of *Batson*, the burden shifts back to the defendant to show "purposeful discrimination." *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859.

At this step, the trial court was required to determine whether the prosecutor's race-neutral reason was actually a pretext for racial discrimination. "Because the trial court's decision on this point requires it to assess the credibility and demeanor of the attorneys before it, the trial court's ultimate decision on a *Batson* challenge is like a finding of fact that must be given great deference by an appellate court." *Commonwealth v. Coker*, 241 S.W.3d 305, 308 (Ky.2007). "In the absence of exceptional circumstances," appellate courts should defer to the trial court at this step of the *Batson* analysis. *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (quoting *Hernandez*, 500 U.S. at 366, 111 S.Ct. 1859).

▆▆▆ The third step of the *Batson* test is where "the persuasiveness of the justification becomes relevant." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "Although a prosecutor theoretically could fabricate a demeanor-based pretext for a racially-motivated peremptory strike, the third step in *Batson* alleviates this concern by permitting the court to determine whether it believes the prosecutor's reasons." *Thomas v. Commonwealth*, 153 S.W.3d 772, 778 (Ky.2004).

The prosecutor's peremptory strike of Juror 73 was based on her demeanor—specifically, what he perceived to be her reaction to the defense counsel's questions about race during voir dire. There is an initial question, then, about whether the trial judge observed the juror's demeanor. The trial judge said that he did not notice any reaction by the juror: "Frankly, I didn't, I didn't notice." Appellant interprets this statement to mean that the judge was looking at the juror and did not see any change in her demeanor, but, in context, it seems more likely that what the judge meant was that he happened not to

be looking in the juror's direction at the time defense counsel asked the relevant questions. Appellant also argues that the fact that the judge and the defense counsel did not see the reaction demonstrates that it did not actually happen.

However, the actions alleged to have been taken by Juror 73—sitting up, crossing her arms, and looking angry—would not be disruptive, and they would not necessarily be noticeable in a room full of people. In addition, the prosecutor was sitting at a table to the side of the rows of chairs for the jury panel, so he could see Juror 73, who was seated near the end of the second row, from a different angle than the judge and defense counsel, who were facing the panel straight-on. It is not implausible that the prosecutor noticed a reaction that the judge and defense counsel did not or could not see.

▆▆▆ In this case, there is no evidence of Juror 73's demeanor except what the prosecutor said. Neither the trial judge nor the defense counsel noticed her alleged reaction. The juror herself was never questioned about her reaction because voir dire had concluded and the panel had been released from the courtroom when the *Batson* issue was raised. And as discussed above, the video recording is unhelpful. Because of the limited evidence available, this case turns on the prosecutor's credibility. "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (internal quotation marks omitted).

The trial court determined that the prosecutor's explanation for the strike was credible and not a pretext, and there are a number of factors that support the trial court's determination. For example, the prosecutor brought up the *Batson* issue of his own accord. *Id.* at 369, 111 S.Ct. 1859

(noting that the fact "that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge" could "be taken as evidence of the prosecutor's sincerity"). The prosecutor also provided a detailed explanation for his reasons for striking Juror 73, and he showed the court his strike sheet to demonstrate that he had not intended to strike her until he saw her reaction to defense counsel's questions near the very end of voir dire. Finally, the prosecutor had appeared frequently in front of the trial judge, and the judge believed that he had no history or pattern of excluding African Americans from juries. *Cf. Snyder v. Louisiana,* 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ("[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted."); *Coker,* 241 S.W.3d at 308–09 (noting that a court could take into account a prosecutor's earlier conduct in a separate case in which a conviction was reversed due to a *Batson* violation). For all of these reasons, the trial court's determination of the prosecutor's credibility was not clearly erroneous, and this Court will not disturb it.

Appellant relies on the recent U.S. Supreme Court case of *Snyder v. Louisiana,* 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), to argue that the trial court erred by not critically assessing the prosecutor's race-neutral reason based on an independent evaluation of Juror 73's demeanor. *Snyder* contains some language that suggests that a trial judge should make findings about the contested juror's demeanor: "[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court *must evaluate* not only whether the prosecutor's demeanor belies a discriminatory intent, but also *whether the juror's demeanor can*

*credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." Id.* at 477, 128 S.Ct. 1203 (emphasis added). In *Thaler v. Haynes,* ⸺ U.S. ⸺, ⸺, 130 S.Ct. 1171, 1174, 175 L.Ed.2d 1003 (2010), however, the Supreme Court clarified that there is no blanket rule that "a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor." If the judge does have the opportunity to observe a juror's demeanor, that information is certainly relevant to the *Batson* analysis: "[W]here the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during the voir dire." *Id.* But there is no requirement that a peremptory challenge must be disallowed if, as here, the judge simply does not observe the juror's demeanor.

## C. Directed Verdict.

■ Appellant argues that he was entitled to a directed verdict because the Commonwealth failed to prove the elements of sodomy as laid out in the jury instruction. The jury instruction under which Appellant was convicted required the jury to find beyond a reasonable doubt that Appellant "engaged in deviant sexual intercourse with Matthew Morgan by penetrating Morgan's anus with his penis" and "[t]hat he did so by forcible compulsion."

■ On appellate review, this Court reviews the trial court's ruling on a motion for a directed verdict as follows: "If under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Commonwealth v. Sawhill,* 660 S.W.2d 3, 5 (Ky. 1983) (quoting *Trowel v. Commonwealth,* 550 S.W.2d 530, 533 (Ky.1977)).

As a general matter, penetration is not an element of first-degree sodomy. Instead, the sodomy statute requires *contact* between the sexual organs of one person and the mouth or anus of another. *Miller v. Commonwealth*, 283 S.W.3d 690, 699 (Ky.2009); KRS 510.070(1)(a). Nevertheless, the jury instruction in this case required the jury to find penetration. This was arguably an error,[3] but it was an error that helped the defendant since it required the Commonwealth to prove a more specific act than what the first-degree sodomy statute requires. This Court has reviewed the evidence and determined that the Commonwealth did produce sufficient evidence of penetration, thus meeting even the unnecessarily specific element in this jury instruction.

The primary evidence of anal penetration by forcible compulsion was Morgan's testimony. At trial, Morgan said that Appellant pulled him off the top bunk, pinned him down, and put his hands on Morgan's throat before putting his penis into Morgan's mouth and anus. Morgan stated several times that Appellant put his penis "in [his] butt" or "in [his] anus," and he said that the anal intercourse lasted for "a few minutes." Morgan's testimony about the attack was consistent with the physical evidence. The SANE nurse testified that she noticed "grip marks" around Morgan's neck, some abrasions on his buttocks, and injuries to his legs. Testing of an anal swab taken by the SANE nurse showed the presence of sperm cells that matched Appellant's DNA.

Appellant argues that it was clearly unreasonable for the jury to find Appellant guilty, in part because there was no corroboration from other witnesses. Appellant points out that two other inmates who were in the same cell block testified that they did not hear anything the night the attack occurred. However, one of the inmates admitted that one could not hear conversations that were going on inside a cell when the cell door was shut. Moreover, this Court has repeatedly held that the unsupported testimony of a victim of a sex crime, if the testimony is not "contradictory or incredible, or inherently improbable," is sufficient to sustain a conviction. *Miller v. Commonwealth*, 283 S.W.3d at 697; *Stoker v. Commonwealth*, 828 S.W.2d 619 (Ky.1992); *Robinson v. Commonwealth*, 459 S.W.2d 147 (Ky.1970).

Appellant also argues that Morgan's account of what happened is "unbelievable" because there was no conclusive physical evidence of penetration. The SANE nurse swabbed both the inside and outside of Morgan's anus, but at trial the lab technician who analyzed the swab did not specify whether the sperm cells that matched Appellant's DNA were found on the inside or outside of Morgan's anus. Thus, Appellant argues, the DNA evidence does not necessarily prove penetration. We note that the DNA evidence does not *disprove* penetration either, and a jury could reasonably believe that this evidence, whether it was found on the inside or outside of the victim's anus, was entirely consistent with

---

**3.** The trial court may have decided to give specific descriptions in the jury instructions to differentiate between the oral and anal sodomy that the victim alleged happened in quick succession. In some cases it is necessary to include specific details in the jury instructions to avoid a unanimous verdict problem. *See Miller v. Commonwealth*, 283 S.W.3d 690, 696–97 (Ky.2009) (holding that it was error to use identical instructions for multiple counts of rape and sodomy "none of which could be distinguished from the others as to what factually distinct crime each applied to"). Here, it probably would have been sufficient for the court to differentiate between the oral and anal *contact*, and so requiring *penetration* as part of the instruction could be considered legal error. Of course, even if this was error, it helped the defendant.

the victim's version of events. Appellant also points out that the SANE nurse did not notice any tearing, bleeding, or trauma to Morgan's anus. Appellant argues that this absence of trauma shows that Morgan's account of forcible, minutes-long anal sex is unbelievable. However, there was no medical testimony about what injury this kind of anal penetration could be expected to cause.

Considering the evidence as a whole, it was not clearly unreasonable for the jury to find Appellant guilty of sodomy. This Court has repeatedly held that there is no requirement that the testimony of a victim of a sexual crime be corroborated by another witness or by physical evidence unless the victim's testimony was "contradictory or incredible, or inherently improbable." *Miller*, 283 S.W.3d at 697. Here, Morgan's testimony was not contradictory, incredible, or improbable. And it was consistent with the physical evidence of his injuries and the presence of Appellant's DNA on the inside or outside of his anus. Therefore, the trial court did not err in refusing to grant a directed verdict, and there was sufficient evidence to support the conviction.

### D. Lesser Included Offense.

Appellant contends that it was error for the judge to deny Appellant's request for an instruction on the lesser included offense of sexual abuse in the first degree. Pursuant to KRS 510.110(1), "[a] person is guilty of sexual abuse in the first degree when ... [h]e or she subjects another person to sexual contact by forcible compulsion...." KRS 510.110(1). Sexual contact is statutorily defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying the sexual desire of either party." KRS 510.010(7). Because there is no evidence in this case from which the jury could believe beyond a reasonable doubt that sexual abuse, but not sodomy, occurred, the denial of Appellant's request for an instruction on the lesser included offense of sexual abuse was not error.

First-degree sexual abuse is properly classified as a lesser included offense of first-degree sodomy. *Johnson v. Commonwealth*, 864 S.W.2d 266, 277 (Ky.1993). The distinction between the two offenses is the body part touched for purposes of sexual gratification. Sexual abuse requires "sexual contact," KRS 510.110, which means "touching of the sexual or other intimate parts of a person," KRS 510.010(7). Sodomy, on the other hand, requires "deviate sexual intercourse," KRS 510.070, which means "any act of sexual gratification involving the sex organs of one (1) person and the mouth or anus of another," KRS 510.010(1). The additional element in a sodomy offense is the specific sexual or intimate parts involved, namely, the mouth or anus.

Thus, an instruction on sexual abuse was only appropriate if the jury could believe that there was sexual contact with a sexual or intimate part of the victim other than his mouth or anus. "An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Miller v. Commonwealth*, 283 S.W.3d at 699 (quoting *Wombles v. Commonwealth*, 831 S.W.2d 172, 175 (Ky. 1992)). Stated otherwise, "an instruction on a lesser included offense is required if the evidence would permit the jury to *rationally* find the defendant not guilty of the primary offense, but guilty of the lesser offense." *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky.2005) (emphasis in original).

After reviewing each item of evidence in the record, the Court concludes that there is no evidentiary foundation for an instruction on sexual abuse. To start with, the trial testimony of Morgan and Appellant does not support an instruction on sexual abuse. Morgan's testimony only supports the primary offense of first-degree sodomy. A rational jury could either believe or disbelieve Morgan's testimony about what happened, but there would be no basis for a jury to find Appellant guilty of sexual abuse but not sodomy based on Morgan's testimony. Likewise, Appellant's testimony that Morgan willingly masturbated him would not entitle Appellant to an instruction on the lesser offense because such an act would not constitute the crime of sexual abuse; if Morgan *willingly* masturbated Appellant, there would be no forcible compulsion, a required element of sexual abuse.

Since the trial testimony of Morgan and Appellant would not entitle Appellant to an instruction on sexual abuse, Appellant asks this Court to interpret the physical evidence in such a way as to support an instruction on first-degree sexual abuse even though there was no theory presented at trial that would meet the elements of sexual abuse. Appellant is correct that "[a]n instruction on a lesser included offense may be authorized even if inconsistent with the defendant's theory of the case, e.g. if it is supported by the Commonwealth's evidence." *Williams v. Commonwealth*, 208 S.W.3d 881, 883 (Ky.2006) (quoting 1 Cooper, *Kentucky Instructions to Juries* § 1.05 (3d ed.1993)). Here, however, there is no evidence that supports the theory of sexual abuse unless, as Appellant requests, the Court reinterprets the evidence in a truly irrational and speculative manner. Appellant argues: "Al-

though Matthew Morgan testified Billy Mash put his penis in Morgan's butt, he did not use the word 'penetration,' and he did not testify as to any pain associated with the alleged penetration. The jury could have reasonably believed that he was mistaken about the penetration or just lying. Presumably, he was facing the other direction when it happened." Appellant's theory appears to be that the physical evidence (the DNA evidence found on the inside or outside of Morgan's anus, and the redness on his buttocks) is consistent with some contact between Appellant's penis and Morgan's buttocks (an intimate part of the body) short of anal contact or penetration.[4] Such contact with the buttocks would constitute sexual abuse instead of sodomy. Appellant argues that because the physical evidence could be construed in such a way, and because one could speculate that Morgan, an adult man, was confused about whether there was penetration—even though he testified unequivocally that Appellant put his penis "in [his] anus"—the jury should have been instructed on first-degree sexual abuse. This theory is merely speculative and is not supported by the evidence. This Court has held: "The duty to instruct on any lesser included offenses supported by the evidence does not require an instruction on a theory with no evidentiary foundation. The jury is required to decide a criminal case on the evidence as presented or reasonably deducible therefrom, *not on imaginary scenarios.*" *Thompkins v. Commonwealth*, 54 S.W.3d 147, 151 (Ky. 2001) (citation omitted) (emphasis added).

Because there was no evidentiary support for the lesser included offense of first-degree sexual abuse, the trial court did not err in refusing to give an instruction on that offense.

---

4. As discussed above, mere contact between Appellant's penis and Morgan's anus would constitute sodomy. KRS 510.070(1)(a); KRS 510.010(1).

### III. Conclusion

For the foregoing reasons, Appellant's conviction is affirmed.

All sitting. All concur.