# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: SEPTEMBER 24, 2015
NOT TO BE PUBLISHED

**Supreme Court of Kentucky**

2014-SC-000392-MR

FINAL

DATE 10-15-15 _[illegible handwriting]_

PHARO WILSON                       APPELLANT

|  |  |
|---|---|
| V. | ON APPEAL FROM KENTON CIRCUIT COURT<br>HONORABLE PATRICIA M. SUMME, JUDGE<br>NO. 12-CR-00765 |

COMMONWEALTH OF KENTUCKY             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A Kenton Circuit Court jury found Appellant, Pharo Wilson, guilty of three counts of criminal attempt to commit murder and found him to be a second-degree persistent felony offender (PFO); later, in a bifurcated trial, he was found guilty of being a felon in possession of a handgun. For these crimes, Appellant was sentenced to a total of seventy years' imprisonment. He now appeals as a matter of right, Ky. Const. § 110(2)(b), and argues that the trial court erred by: (1) denying Appellant's *Batson* motion; (2) allowing the prosecution to admit text messages without authentication; (3) failing to instruct the jury on applicable lesser-included offenses; and (4) improperly allowing Appellant's single prior felony conviction to be used as the basis for both his felon in possession of a handgun and PFO charges.

# I. BACKGROUND

Carolyn Sleet called police to report an armed robbery during a poker game at her apartment in the City Heights housing projects in Covington, Kentucky. She informed the 911 operator that one of the players robbed the others at gunpoint. When police responded, Sleet identified the robber as Appellant and indicated that he played several hands of cards before robbing the other players. Sleet told police that Appellant also pointed the gun at her, but that he left after she begged him to do so. Sleet described Appellant's attire and told officers that his girlfriend, Keyairow Green, also lived in the projects. Several officers left Sleet's apartment and went to Green's, where police found her alone. Police searched the apartment and did not find Appellant, but they did find his wallet on Green's kitchen table.

When the officers discovered that Green's mother, Carla Mullins, also lived in City Heights, they went to her apartment in search of Appellant. When no one answered the door at Mullins's apartment, one of the officers returned to Green's apartment, where he discovered Mullins had gone to check on Green, who was eight months pregnant. Mullins indicated that she had left her door unlocked in case Green needed her during the night and that she had awoken earlier to Appellant pacing back and forth in her apartment. Mullins assumed something was wrong with Green when Appellant asked Mullins where Green was, and left her apartment to check on her daughter. Mullins gave the officers a key to her apartment and they returned to her unit.

2

When they arrived back at Mullins's apartment, the officers divided, with some going to the rear of the building and others to the front door. One of the officers at the front door heard shouting of "show me your hands" followed by gunshots. At that point, the two officers stationed at the front door went to the back of the building to assist, where they found the officers at the back of the building engaged in a shootout with a man hanging out of a second-story window. One of the officers was shot in the big toe and another received a grazing wound to his leg. In the ensuing confusion, the man shooting at the officers retreated into the apartment, eventually escaping out the front door and running into a wooded area behind the building.

Based on the card players' statements and the belief that it was Appellant who shot at officers from Mullins's apartment, an arrest warrant was issued for Appellant. Appellant was arrested several days later and eventually indicted and charged with three counts of attempted murder, one count of first-degree assault, three counts of third-degree assault, possession of a handgun by a convicted felon, and of being a second-degree PFO. In a separate indictment, Appellant was later charged with one count of first-degree robbery. A Kenton Circuit Court jury found Appellant guilty of three counts of attempted murder, acquitted him of first-degree robbery, and found him to be a second-degree PFO; later, in a bifurcated trial, he was found guilty of being a felon in possession of a handgun. For these crimes, Appellant was sentenced to a total of seventy years' imprisonment and now appeals to this Court.

## II. ANALYSIS

### A. *Batson* Challenge

Appellant first argues that the trial court erred in denying his *Batson* challenge. Appellant, an African-American male, objected to the Commonwealth's peremptory strike of an African-American female, the last remaining member of a minority on the jury panel.

During the Commonwealth's voir dire, it asked the jury panel several questions concerning the City Heights housing project where the shots were fired. In response to these questions, a few of the jurors acknowledged that they had knowledge of the projects and had family or friends who had lived there at some point. One of those jurors indicated that his wife and brother-in-law lived there twelve or thirteen years ago and that he had a co-worker who lived at City Heights at one time. Another juror indicated that she had friends who had lived in the housing projects forty-five years earlier and yet another juror indicated that her husband had lived there many years ago as a child. The juror in question, M.D., was the only juror who responded that she had relatives living in the projects at the time of Appellant's trial. In fact, while she denied knowing their exact address or ever visiting their apartment, she said her two nephews lived on the same street as the building from which the shots were fired in this case. Her nephews were also close in age to Appellant and she stated "they know just about everybody up there." She indicated she believed it was a "rough" neighborhood based upon information her nephews had relayed to her.

4

When the parties were exercising their peremptory strikes, the Commonwealth moved to strike M.D. Appellant's counsel objected to the strike, arguing that it violated the dictates of *Batson v. Kentucky*, 476 U.S. 79 (1986). As this Court has stated:

> In *Batson,* the U.S. Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. *Id.* at 96-98, 106 S.Ct. at 1722-24. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.* at 96-97, 106 S.Ct. at 1722-23. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724.

*Commonwealth v. Snodgrass*, 831 S.W.2d 176, 178 (Ky. 1992). We will follow this three-prong test in analyzing Appellant's claim of error, keeping in mind that "the ultimate burden of showing unlawful discrimination rests with the challenger." *Rodgers v. Commonwealth*, 285 S.W.3d 740, 758 (Ky. 2009). We give the trial court's ruling on the *Batson* motion great deference and will review for clear error. *Mash v. Commonwealth*, 376 S.W.3d 548, 555 (Ky. 2012).

First, Appellant had to make a prima facie showing that the Commonwealth used its peremptory challenge to strike M.D. on the basis of her race. The trial court found that the Appellant made this showing, and we need not address this first matter further, as "once the Commonwealth has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate issue of discrimination, the preliminary issue

5

of whether the defendant has made a prima facie showing is moot." *Gamble v. Commonwealth*, 68 S.W.3d 367, 371 (Ky. 2002).

Once Appellant made his prima facie case, the burden shifted to the Commonwealth to provide a race-neutral explanation for its strike. We have held that this race-neutral reason does not have to rise to the level of a strike for cause and that "[t]he test is whether the prosecutor has a good-faith belief in the information and whether he can articulate the reason to the trial court in a race-neutral manner which is not inviolate of the defendant's constitutional rights." *Snodgrass*, 831 S.W.2d at 179. "At this step, all that is required is that a prosecutor's articulated reason for exercising a peremptory challenge be racially neutral on its face." *Chatman v. Commonwealth*, 241 S.W.3d 799, 803-04 (Ky. 2007). "This step sets a fairly low bar for the Commonwealth to meet." *Mash*, 376 S.W.3d at 555. Furthermore, the United States Supreme Court has held, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

Here, the Commonwealth gave several reasons for striking M.D. including her body language, her "intimate knowledge of City Heights" due to the fact that her nephews lived there, that her nephews knew "just about everybody up there," and that her nephews had told her it was a rough neighborhood. The Commonwealth did not believe M.D. was forthcoming when questioned about whether she knew any members of two of the area's families,

saying that it would be hard to believe than anyone who lived in City Heights would not have some knowledge. The Commonwealth also pointed out that M.D.'s address on the jury list was just a few blocks away from one of the prominent streets in the housing project.

Then, defense counsel pointed out that M.D. does not live in City Heights and does not even know the exact location at which her nephews live. Appellant's counsel stated that there were several other jurors who had familial ties to City Heights who were not stricken. But, the Commonwealth countered that those ties were old, whereas M.D. had family members currently living on the same street as that on which the crime occurred. The Commonwealth stated that it was a distinct possibility that M.D.'s nephews knew Appellant since he spent a lot of time in City Heights and was around their age. The prosecutor believed these factors made M.D. more susceptible to outside influence and information without regard to her skin color and stated that this was the reason it wanted to strike her from the venire.

The reasons offered by the Commonwealth for striking M.D. are all facially race-neutral, as they could apply to jurors of any racial background. As there was no discriminatory intent inherent in the Commonwealth's explanation, the trial court did not err in this regard.

Appellant argues that the trial court's analysis stopped when it found that the Commonwealth gave a facially race-neutral reason for the strike rather than moving on to *Batson*'s third step. We disagree, as the trial court went into an extensive review of its observations regarding the juror in question.

The third prong of *Batson* requires the trial court to "determine whether the defendant has carried his burden of proving purposeful discrimination." 476 U.S. at 98. "In other words, having properly found that the Commonwealth's proffered reason was, on its face, racially neutral, the final step was for the trial court to determine if the Commonwealth's race-neutral reason was actually a pretext for racial discrimination. Because the trial court's decision on this point requires it to take credibility and demeanor of the attorneys into account, the trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky. 2007).

The trial court indicated that it was very cognizant of M.D.'s responses during voir dire due to the fact that she and Appellant were members of the same minority. It also noted the nature of the small community in which the events leading up to the shooting took place. Without making a presumption about whether M.D. actually knew anything concerning the crime, the trial court noted that she does have two nephews who lived close by and that it is difficult not to draw inferences from that fact. The trial court stated that it carefully observed M.D.'s body language during voir dire, anticipating a *Batson* challenge, and noticed an immediate shift when Appellant's defense attorney started asking voir dire questions. According to the trial court, M.D. relaxed, smiled, and was responsive to Appellant's counsel's questions "which was not how she was to the prosecution." When Appellant's counsel pointed out that there were several jurors who were not responsive to the Commonwealth's

8

questions, the trial court agreed, but again pointed to the "notable" difference between when the Appellant's attorney asked questions and when the Commonwealth did the same.

Appellant argues that the Commonwealth's reasons were not enough and that the trial court did not properly apply *Batson*'s third step. He points to the fact that the "small community" referenced was predominately African American and that this could not be a race-neutral reason. However, we note that none of the other jurors who stated they knew someone who had lived in the neighborhood were African American.

Appellant also argues that the Commonwealth's statement that it was uncertain if M.D. was truthful about not knowing any members of two families in the area (who happened to be African-American families related to one of the individuals Appellant allegedly robbed at gunpoint) is not a race-neutral reason, as it was akin to saying that because M.D. was black, she should know the other black families in the area. Having viewed the video record, we find no such overtones in the Commonwealth's statements. As previously stated, M.D.'s address listed on the jury sheet was in close proximity to City Heights and she had two nephews who lived there. Given the context, it appears that the prosecutor was commenting on the proximity of M.D.'s address to City Heights and the fact that she had family living in the projects.

The trial court went to great lengths to discuss its observations of M.D. during voir dire and ultimately found that Appellant failed to carry his burden of proving purposeful discrimination. The trial court sat in a unique position to

9

assess the Commonwealth's credibility and we give its determination great deference. We hold that there was no clear error in the trial court's denial of Appellant's *Batson* challenge.

## B. Authentication

Appellant next argues that the trial court erred in allowing the Commonwealth to admit text messages without proper authentication. These messages included, among other things, statements indicating that the person who sent the texts identified himself as "pharo." The messages also included statements concerning the shooting.[1]

---

[1] The text messages were submitted along with a notarized affidavit from the records custodian from Cincinnati Bell certifying that the cell phone records were true and accurate and "were made at or near the time of the occurrence of the matters set forth in the records by (or from information transmitted by) a person with knowledge of those matters. These records are kept in the course of Cincinnati Bell's regularly conducted business and were made by the regularly conducted activity as a regular practice."This certification was in line with KRE 902, entitled "Self-Authentication," which reads, in pertinent part:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:
>
> . . . .
>
> (11) Business records.
>
> > (A) Unless the sources of information or other circumstances indicate lack of trustworthiness, the original or a duplicate of a record of regularly conducted activity within the scope of KRE 803(6) or KRE 803(7), which the custodian thereof certifies:
> >
> > > (i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> > >
> > > (ii) Is kept in the course of the regularly conducted activity; and
> > >
> > > (iii) Was made by the regularly conducted activity as a regular practice.

10

At trial, Appellant's counsel argued that it was not clear that all of the text messages in question were sent from Appellant, as, on a few occasions, the person texting from the phone number identified himself as "mario." Defense counsel pointed out that all of the messages in which the individual identified himself as "pharo" occurred the day before the shooting and that there is no proof that Appellant was the one who sent the text messages in question regarding the shooting.

The prosecution countered at trial that, in its opening statement, the defense alleged that Appellant only fired two shots and described them as being two stories over the police officers' heads—in stark contrast to testimony which would be introduced at trial by the officers that Appellant fired approximately ten shots directly at them. Therefore, the prosecution particularly wanted to introduce one of the text messages that read, "how many got shot cuz I was letting loose" to contradict the opening statement. The Commonwealth argued this would allow the jury to infer that Appellant fired more than two shots and would also tend to prove that Appellant knew he was shooting at more than one police officer (which, it argued, was relevant, given that Appellant was charged with three counts of attempted murder). The prosecution also wanted to introduce a few other text messages to show that it was Appellant's phone and to show that people began texting Appellant at that number when they found out he had been in a shootout with police.

Ultimately, the trial court allowed the introduction of some of the text messages, finding that the connection between Appellant and the phone was clear. The trial court went on to find that the records were self-authenticating business records under KRE 902 and created a significant indicia of reliability. The admitted text messages included several in which the person at the phone number in question identified himself as "mario" and several in which he identified himself as "pharo." The admitted messages also included messages related to the shooting.

Appellant agrees that the messages were obtained from the phone company and amounted to business records made in the ordinary course of business, however, he argues that, in spite of this fact, they were still not properly authenticated, as the prosecution failed to prove that Appellant was the person who actually sent or received the text messages. The Commonwealth responds that these messages were properly authenticated, as two witnesses testified that the phone number for which the records were obtained was the number they used to get in touch with Appellant. Specifically, Carla Mullins testified that she had Appellant's number saved in her phone under "Pharo" and that when she wanted to call him, she would find that entry in her phone and press call. When she called the number saved in her phone, Mullins testified that she reached Appellant. Keyairow Green also testified that she had used Mullins's cell phone to initiate and receive calls and text messages from Appellant. She stated that Appellant's number was saved in Mullins's phone under the name "Pharo" and that it was a reliable way to get

12

in touch with Appellant and that he replied to text messages sent to that number.

The Commonwealth argues that there is ample evidence that Appellant sent the messages. Not all of the messages certified by Cincinnati Bell and included in the record were admitted at trial, as they were redacted, but the Commonwealth points out that the individual responding from the number in question identified himself as "pharo" in the text messages several times. This Court notes that it examined the records carefully and found no less than six instances in which the individual identified himself as "pharo" and one in which he answered "p.h.a.r.o" when another person asked who he was. The Commonwealth also notes in its brief that Appellant eventually conceded at trial that he was the individual who fired the shots and that some of the admitted text messages discussed details about the shooting. Having explained the parties' arguments, we turn now to the law surrounding authentication.

"The concept of authentication (or the laying of a 'foundation,') relates to a trial court's need for preliminary proof of two things: (1) the pertinence of the proposed evidence to the litigation, and (2) that a document is what its proponent claims it to be." *Bell v. Commonwealth*, 875 S.W.2d 882, 886 (Ky. 1994). Furthermore, "a party seeking to introduce an item of tangible evidence need not satisfy an 'absolute' identification requirement, and evidence is admissible if the offering party's evidence reasonably identifies the item. We grant trial courts wide discretion over issues relating to the admissibility of

13

tangible evidence because the foundation sufficient for admissibility will vary based on the nature of the item . . . ." *Grundy v. Commonwealth*, 25 S.W.3d 76, 80 (Ky. 2000) (footnote omitted). "On appellate review, the trial court's finding of authentication is reviewed for abuse of discretion." *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004). For the reasons that follow, we affirm the trial court and hold that it did not abuse its discretion.

Kentucky Rules of Evidence 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule goes on to provide examples of authentication that comport with the rule and specifically includes "[t]estimony of witness with knowledge. Testimony that a matter is what it is claimed to be." KRE 901(b)(1). Another example the rule gives is "[d]istinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." KRE 901(b)(4).

As previously noted, Appellant does not argue that there was any problem with the text messages themselves or that they had been modified from their original form, but rather, Appellant argues that the Commonwealth did not prove that Appellant was the individual who sent and received them. However, as this Court held in *Ordway v. Commonwealth*, 352 S.W.3d 584, 593 (Ky. 2011) when reviewing the authentication of a letter purportedly written by the appellant in that case: "[t]he burden on the Commonwealth to establish

14

that the letter was written by Appellant is 'slight' and requires only a prima facie showing. *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky.2010). The contents of the letter, taken in conjunction with the circumstances, can be relied upon in determining authentication. KRE 901(b)(4)."

As detailed above, two witnesses with knowledge of Appellant's cell phone number testified that they both used the number in question to get in touch with him. This was proper evidence for authentication pursuant to KRE 901(b)(1). Furthermore, the content of the texts, including several instances in which the individual sending and receiving text messages at that number identified himself as "pharo" and gave details concerning the shooting provided authentication, just as the contents of the letter in *Ordway* did.

We hold that the Commonwealth's evidence reasonably identified the text messages as required by *Grundy*, 25 S.W.3d at 80. Therefore, given the testimony presented at trial and the context of the text messages, the trial court did not abuse its discretion in admitting them.

Appellant also argues that the text messages amounted to inadmissible hearsay. Appellant only cites one case from the Pennsylvania Supreme Court, *Commonwealth v. Koch*, 39 A.3d 996 (Pa. Super. Ct. 2011), for this premise. In *Koch*, a police detective had transcribed messages from Appellant's phone. This differs markedly from the business records secured from the phone company in the case at bar. Furthermore, KRE 803(6) provides an exception to the prohibition against hearsay for "[r]ecords of regularly conducted activity." Appellant admits that the records in this case were regularly maintained by

15

Cincinnati Bell. Since the records of the text messages fall under an exception to our general prohibition against hearsay, and Appellant cites no case law binding upon this Court that suggests otherwise, we will delve into the issue no further and affirm the decision of the trial court.

## C. Jury Instructions

Appellant next alleges that the trial court erred when it failed to instruct the jury on applicable lesser-included offenses. Specifically, Appellant tendered jury instructions to the trial court which would have instructed the jury on the lesser-included offense of wanton endangerment in both the first and second degrees. The trial court rejected these proffered instructions and instructed the jury only on three counts of attempted murder and three degrees of assault as lesser-included offenses.

This Court reviews a trial court's refusal to give a lesser-included offense instruction under the 'reasonable juror' standard set out in *Allen v. Commonwealth*:

> [W]e review a trial court's decision not to give a criminal offense jury instruction under the same "reasonable juror" standard we apply to the review of its decision to give such an instruction. *See Commonwealth v. Benham,* 816 S.W.2d 186 (Ky. 1991). Construing the evidence favorably to the proponent of the instruction, we ask whether the evidence would permit a reasonable juror to make the finding the instruction authorizes. We typically do not characterize our review under this standard as either *de novo* or for abuse of discretion . . . . In this context, the characterization makes little difference and so the inconsistency is more apparent than real. . . . Regardless of the characterization, however, the "reasonable juror" is the operative standard, in the appellate court as well as in the trial court.

16

338 S.W.3d 252, 255 (Ky. 2011). Therefore, we construe the evidence most favorably to the proponent of the instruction and "ask whether the evidence would permit a reasonable juror to make the finding the instruction authorizes." *Id.*

The trial court has the duty in a criminal case "to prepare and give instructions on the whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999). However, "[a]n instruction on a lesser-included offense is appropriate if and only if on the given evidence a reasonable juror could entertain reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Skinner v. Commonwealth*, 864 S.W.2d 290, 298 (Ky. 1993).

In order for the jury to convict Appellant of criminal attempt to commit murder, it had to believe beyond a reasonable doubt that Appellant shot at the officers with the intent to kill them and that this constituted a substantial step in a course of conduct planned to result in their death. Appellant insists that the instructions should have contained the lesser-included offenses of first- and second-degree wanton endangerment. Under such instructions, the jury would have had to believe beyond a reasonable doubt either that—for first degree wanton endangerment—Appellant discharged a handgun, thereby wantonly creating a substantial danger of death or serious physical injury to the officers and that this conduct manifested an extreme indifference to the

17

value of human life; or—for second-degree wanton endangerment—that Appellant discharged a handgun and, thereby, wantonly created a substantial danger of physical injury to the officers.

We find the commentary accompanying the statutes for first- and second-degree wanton endangerment instructive here. The commentary provides: "The offenses created by KRS 508.060 and 508.070 can best be described by use of this hypothetical situation: D, with no intent to kill or injure but with an awareness of the risk involved, shoots a gun into an occupied building, thereby consciously disregarding the risk of death or injury to its occupants." We have held: "[f]iring a weapon in the immediate vicinity of others is the prototype of first degree wanton endangerment. This would include the firing of weapons into occupied vehicles or buildings." *Swan v. Com.*, 384 S.W.3d 77, 102 (Ky. 2012) (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2), at 388 n. 142 (1998) (internal quotation marks omitted)).

In *Swan*, the appellants had fired shots into the ceiling of a home toward specific individuals located in the front of said home. *Id.* at 84-86. This Court held that one of the individuals in the home was not wantonly endangered, as she had hidden in the other end of the home, and no evidence was presented at trial that "a bullet was fired in [her] direction." *Id.* at 103. That is not the case here. The officers testified that Appellant had the gun angled downward toward them, and one of the officers testified that he saw Appellant aiming at him. Appellant was not merely firing into a home where he could not actually

18

see his would-be victims, as was the appellant in *Swan*—and not testimony was presented to that regard. Rather, from the evidence, we cannot hold that "a reasonable juror could entertain reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Skinner*, 864 S.W.2d at 298. The evidence in the present case simply does not support a finding that Appellant acted with no intent to kill or injure the officers.

Appellant attempts to distinguish the case at bar from this Court's decision in *Goodman v. Commonwealth*, No. 2007-SC-000290-MR, 2008 WL 2167538, at *5 (Ky. May 22, 2008), where we held, "[t]he totality of the evidence demonstrates that Appellant's shots were intentional and purposeful. No wanton endangerment instruction was warranted and there was no error." In that case, evidence was presented at trial that the appellant told one of the officers that he would shoot her in the head. Appellant argues that the fact that he made no such statement to police is enough to set his case apart from *Goodman*. However, while Appellant did not explicitly tell the officers that he planned to shoot them in the case at bar, evidence was presented that Appellant yelled something like "fuck you bastards" to the police before he began shooting. Coupled with the officers' testimony that Appellant was pointing the gun in their direction and/or aiming at them, a reasonable juror could not have found that he acted wantonly rather than intentionally.

Defense counsel attempted to use the fact that only two shell casings were recovered from the scene to argue that Appellant only fired two shots,

which amounted to warning shots fired twenty feet above the officers' heads. However, the fact that officers fired a total of 32 rounds and only 20 of their shell casings were recovered from the scene shows that not all of the casings were recovered. Two of the officers were shot—one in the toe and another received a grazing wound to his leg. The properly-admitted text messages included one text sent by the number known to at least two witnesses to be Appellant's which read "how many got shot cuz I was letting loose." This statement provides more evidence of Appellant's intent. In fact, the Appellant points to no evidence contained in the record that he acted wantonly (and nor do we find any).

We also distinguish this case from our recent opinion in *Hall v. Commonwealth*, No. 2012-SC-000423-MR, 2015 WL 4967454, at *11 (Ky. Aug. 20, 2015) (not yet final as of the rendition of this opinion). In *Hall*, the appellant argued that he should have received a directed verdict on four counts of wanton endangerment. The appellant therein used a high-power hunting rifle to kill two of his neighbors, one of whom fell in the doorway of his home when struck. There were four children inside the home and, in addition to two counts of murder, the appellant was convicted of first-degree wanton endangerment as to the children. *Id.* That case is unlike the present case. Here, Appellant was aiming at the officers when he fired his weapon. Had Appellant been charged with attempted murder as to bystanders at whom he was not intentionally aiming, an instruction for wanton endangerment would have been warranted. However, those are simply not the facts with which we

20

are presented. "To be convicted, the defendant must have both acted with the requisite mental state and created the danger prohibited by the statute." *Id.* There was no evidence presented that Appellant acted anything less than intentionally when firing at the officers.

The evidence at trial would not have allowed a reasonable juror to find that Appellant had committed the crime of wanton endangerment. Therefore, the trial court did not err in failing to instruct the jury on first- and second-degree wanton endangerment as a lesser included offense.

## D. Prior Felony Conviction

Appellant's final argument is that the trial court improperly allowed Appellant's one prior felony conviction to be used as the basis for his convictions for both felon in possession of a handgun and second-degree PFO. At trial, the parties stipulated that Appellant had only one prior felony, and the trial court ruled that the possession of a handgun count could not be enhanced, thus limiting any potential PFO enhancement to Appellant's criminal attempt to commit murder convictions.

This Court decided this very issue only two years ago in *Oro-Jimenez v. Commonwealth*, 412 S.W.3d 174, 180 (Ky. 2013). Prior to that case, this Court had never ruled on a double enhancement case where one prior felony conviction had been used to both establish an offense (felon in possession of a handgun) and enhance the sentence for another. However, we noted that "the Court of Appeals addressed this scenario in *O'Neil v. Commonwealth*, 114 S.W.3d 860 (Ky.App.2003). In *O'Neil*, there was no double enhancement when

a single prior felony conviction was used to establish the offense of possession of a handgun by a convicted felon and to enhance a second-degree burglary sentence. 114 S.W.3d at 864." In *Oro-Jimenez*, we adopted the Court of Appeals' reasoning in *O'Neil* and held "the use of Appellant's single prior felony conviction to establish the offense of possession of a handgun by a convicted felon *and* to enhance the first-degree robbery sentences under the PFO statute, did not constitute double enhancement. Thus, the Commonwealth's use of Appellant's single prior felony conviction was not error . . . ."

Just as in *Oro-Jimenez*, Appellant's prior felony was used to create his charge of felon in possession of a handgun (but not also to enhance it) and to enhance his penalties for other felonies. We see no reason to depart from our recent precedent which considered this very issue, and, therefore, affirm the trial court.

### III. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions and corresponding sentence.

All sitting. All concur.

22

COUNSEL FOR APPELLANT:

Linda Roberts Horsman, Assistant Public Advocate

COUNSEL FOR APPELLEE:

Jack Conway, Attorney General of Kentucky
Matthew Robert Krygiel, Assistant Attorney General