# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 14, 2018
NOT TO BE PUBLISHED

Supreme Court of Kentucky

2016-SC-000557-MR

WARREN FRYER            APPELLANT

ON APPEAL FROM HARDIN CIRCUIT COURT
V.            HONORABLE KEN HOWARD, JUDGE
NO. 15-CR-00513

COMMONWEALTH OF KENTUCKY            APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Warren Fryer appeals as a matter of right from the Hardin Circuit Court judgment sentencing him to twenty years' imprisonment for first-degree robbery, first-degree assault, and for being a second-degree persistent felony offender. Before trial, Fryer moved to suppress the victim's out-of-court photo identification and to exclude Rahiim Muhammad as a witness or, alternatively, for a continuance to prepare for Muhammad's testimony that Fryer made incriminating statements to him. At trial, Fryer made a *Batson* motion,[1] noting

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

that the Commonwealth struck three out of seven African-American jurors in the venire. The trial court denied all of these motions.

On appeal, Fryer argues that the trial court erred by denying the foregoing motions and by allowing testimony regarding Lonnie Brand's guilty plea and the subsequent vouching for Brand by the prosecutor in closing argument. Finding no error, we affirm the trial court.

## FACTS AND PROCEDURAL HISTORY

Melchizedek Fitzgerald contacted Lonnie Brand and made arrangements to purchase marijuana. The two planned to meet near an apartment complex in Radcliff, Kentucky, during the early morning hours of August 5, 2016. As Fitzgerald got out of his vehicle and approached Brand, Fryer emerged from behind the apartment building with a gun. Fryer aimed his gun at Fitzgerald. Fitzgerald put his hands up and Fryer reached into his pockets and took his phone, keys and wallet. As Fryer began walking away, Fitzgerald made a comment which prompted Fryer to turn back around. Upon seeing Fryer turn around, Fitzgerald turned his back and walked away. Fryer shot Fitzgerald in the femur, causing him to collapse. He subsequently spent a week hospitalized at the University of Louisville Hospital, and has continuing mobility issues.

When police arrived on the scene, Fitzgerald was able to identify himself but unable to provide any further information at the time. When interviewed by the police at the hospital later that afternoon, Fitzgerald initially said he was at the apartment complex to meet a woman, but later admitted that he had

2

gone there to buy marijuana. Fitzgerald was very hesitant to answer questions because he feared for his life.

Once Fitzgerald started discussing the shooting with the police, he stated that the man who shot him had the last name "Gregory." Fitzgerald knew the man by the first name "Warren" because he lived near Fitzgerald, who had once given the shooter a ride. Later, during trial, Fitzgerald testified that he thought Fryer's last name was Gregory at the time but later learned it was Fryer. After determining the suspect was Warren Fryer, Detective Levi Mattingly requested that a six-person photo lineup, including a photo of Fryer, be expedited by the Kentucky State Police, who regularly generate photo lineups.

Sergeant Kirkpatrick presented the lineup to Fitzgerald while Detective Mattingly was in the hospital room. Sergeant Kirkpatrick first stated his name, purpose for being there, and read a standard form presented to victims or witnesses before participating in a photo identification. While Sergeant Kirkpatrick acknowledged that any officer could have presented the lineup, he stated that he wanted to do it because he did not know the suspect or the victim. Fitzgerald immediately identified photo number five, the photo of Fryer, as the person who robbed and shot him. As noted, the trial court later denied the defense motion to suppress the photo identification.

The case proceeded to trial on August 10, 2016, and Fryer was ultimately convicted of one count of first-degree assault, one count of first-degree robbery, and one count of being a persistent felony offender in the second-degree. Fryer was sentenced to an enhanced sentence of twenty years for each charge, to run

3

concurrently. Additional facts will be discussed where relevant to the issues raised.

## ANALYSIS

### I.    The Trial Court Did Not Err in Denying Fryer's *Batson* Motion.

Fryer argues that the trial court abused its discretion in denying the *Batson* motion and allowing the Commonwealth to peremptorily strike three African-American jurors in the venire. Fryer is African-American. The initial jury venire included seven African-Americans. The Commonwealth used their peremptory strikes on three of the seven African-Americans: Jurors A, B and C.

In support of the *Batson* challenge, Fryer's counsel made the following assertions: Juror A stated that she had one interaction with the police and it was not a fair outcome, but further stated that she would not hold that against the Commonwealth; Juror B did not make any comments; and Juror C stated that he had gone to school with a few of the Gregorys.[2]

In response, the Commonwealth pointed out that there was another minority still in the juror panel. Juror A had raised her hand as being in favor of legalizing marijuana and the Commonwealth struck her and two non-African American jurors who were also in favor of legalization. Additionally, the Commonwealth stated that Juror B had an extensive criminal history and raised his hand as having a negative experience with the police. The

---

[2] During initial conversations with the police, Fitzgerald said the name "Gregory" when the police asked who robbed and shot him. Later, Fitzgerald stated that he believed Warren Fryer was a Gregory, and that was why he initially used that surname.

4

Commonwealth added that in addition to Juror C knowing the Gregorys and having a criminal record, they were also informed that Juror C was giving counsel "not very nice" looks. The Commonwealth stated that they struck non-minority jurors for giving similar looks.

The trial court asked the defense for arguments as to why the Commonwealth's proffered reasons were pretext for discrimination. Fryer's counsel stated that criminal histories and giving bad looks are not reasons to strike jurors. In response, the trial court stated that it was satisfied with the Commonwealth's race-neutral justifications for their juror strikes and denied the *Batson* motion.

In *Batson*, the United States Supreme Court set forth a three-step process for determining whether peremptory strikes were used to strike jurors on the basis of race in violation of the Equal Protection Clause:

> First, the defendant must make a prima facie showing of racial bias for the peremptory challenge. Second, if the requisite showing has been made, the burden shifts to the Commonwealth to articulate clear and reasonably specific race-neutral reasons for its use of a peremptory challenge. While the reasons need not rise to the level justifying a challenge for cause, self-serving explanations based on intuition or disclaimer of discriminatory motive are insufficient. Finally, the trial court has the duty to evaluate the credibility of the proffered reasons and determine if the defendant has established purposeful discrimination. A judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact.

*Gamble v. Commonwealth*, 68 S.W.3d 367, 371 (Ky. 2002) (internal quotations and citations omitted). A trial court's denial of a *Batson* motion is reviewed for clear error. *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000).

This Court has determined that once the Commonwealth offers race-neutral reasons for the peremptory strike and the trial court has ruled on the discrimination issue the first step in the analysis — the defendant's *prima facie* showing of racial bias — is moot. *Gamble*, 68 S.W.3d at 371. Here the Commonwealth provided race-neutral reasons for striking the three jurors subject to the *Batson* motion, rendering the first prong of the analysis moot.

The second prong of the test requires the Commonwealth to provide "clear and reasonably specific" race-neutral reasons for the peremptory strikes. *Id.* The Commonwealth reiterated that Juror A raised her hand when asked whether any jurors had a negative experience with the police. Additionally, Juror A raised her hand as being in favor of legalizing marijuana, and the Commonwealth struck two non-African-American jurors who were also in favor of legalization. Jurors B and C both had criminal records, and Juror C was acquainted with the Gregorys,[3] who were a subject of conversation between the police and the victim while ascertaining the identity of the perpetrator. The Commonwealth also stated that Juror C was giving counsel "not" very nice looks, and that they struck other jurors, who were not minorities, for the same behavior.

After confirming that all jurors who raised their hands as being in favor of legalizing marijuana were struck, which happened to include Juror A, the trial court stated that it was satisfied with the Commonwealth's race-neutral

---

[3] The Gregorys were apparently a family well known to local law enforcement officials.

6

justifications for the juror strikes and denied the *Batson* motion. We similarly find that the Commonwealth's race-neutral reasons for its strikes were sufficient to pass *Batson* muster.

The second step of the *Batson* analysis does not require the Commonwealth's reasons for exercising a peremptory strike to be persuasive or plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). This step is a "fairly low bar for the Commonwealth to meet." *Mash v. Commonwealth*, 376 S.W.3d 548, 555 (Ky. 2012). Here the facial validity of the Commonwealth's explanation is assessed and, unless discriminatory intent is inherent in the justification for the strike, the proffered reasons will be deemed race-neutral. Since there is no discriminatory intent inherent in the Commonwealth's explanations for striking Jurors A, B, and C, the second prong of the *Batson* analysis is satisfied. *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

In the third step of the *Batson* analysis, the burden shifts back to the party challenging the strike to prove "purposeful discrimination." *Hernandez*, 500 U.S. at 359. Here the trial court must determine whether the Commonwealth's reasons behind exercising the strikes were merely a pretext for racial discrimination. *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky. 2007). This step requires the trial court to assess the credibility and demeanor of the attorneys. *Commonwealth v. Coker*, 241 S.W.3d 305, 308 (Ky. 2007). Since this is comparable to a finding of fact, the trial court must be afforded great deference. *Chatman*, 241 S.W.3d at 804.

7

As to Juror C, Fryer relies on the United States Supreme Court case *Snyder v. Louisiana* to support the argument that the trial court erred in failing to assess whether a "juror's demeanor [could] credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." 552 U.S. 472, 477 (2008). However, two years later the United States Supreme Court clarified that there is no rule that "a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor." *Thaler v. Haynes,* 559 U.S. 43, 48 (2010). Further, this Court has held that there is no requirement that a peremptory strike be disallowed if the trial judge does not observe the juror's demeanor. *Mash,* 376 S.W.3d at 557. "Although a prosecutor theoretically could fabricate a demeanor-based pretext for a racially-motivated peremptory strike, the third step in *Batson* alleviates this concern by permitting the court to determine whether it believes the prosecutor's reasons." *Thomas v. Commonwealth,* 153 S.W.3d 772, 778 (Ky. 2004). Here the trial court did not comment on the Commonwealth's demeanor-based justification for the strike.

While the Commonwealth brought up Juror C's demeanor in the explanation for using a peremptory challenge, the Commonwealth also relied on the fact that Juror C had a criminal record and stated he knew the Gregorys, who were discussed in the case. Since the demeanor-based reason was given in conjunction with additional reasons, the peremptory strike was validly upheld by the trial court. *Thomas,* 153 S.W.3d at 777.

8

In this case, the Commonwealth provided race-neutral reasons for striking Jurors A, B, and C, and the defense offered very little to rebut the Commonwealth's justifications. "[T]he ultimate burden of showing unlawful discrimination rests with the challenger." *Rodgers v. Commonwealth*, 285 S.W.3d 740, 758 (Ky. 2009). When asked to respond to the Commonwealth's reasons for the peremptory strikes, Fryer failed to provide any persuasive argument as to why those reasons were merely a pretext for discrimination. When considering the lack of a persuasive argument paired with the great deference given to the trial court, this Court cannot find that the trial court's ruling was clearly erroneous.

## II. The Trial Court Properly Allowed the Testimony of Rahiim Muhammad and There Was No Valid Justification for a Continuance.

The jury trial was originally scheduled for February 22, 2016. Prior to bringing in the jury, Fryer moved for a continuance in order to review an interview with Lonnie Brand that occurred a week earlier. Fryer also stated that he just learned about the possible testimony of Rahiim Muhammad, who was incarcerated with Fryer and allegedly heard details relevant to the case. The defense requested time to prepare because their theory of defense could change based on the new information.

In response, the Commonwealth stated that they had not spoken with Muhammad, did not have a statement from him, and did not know whether he would be called as a witness. The trial court granted the motion for a continuance for approximately one month to allow the defense an opportunity

9

to explore the new evidence and prepare for trial. When the parties met again for a status conference a month later, the trial was rescheduled for August 10, 2016.

On August 4, 2016, the Commonwealth filed a Kentucky Rules of Evidence (KRE) 404(b) notice that Lonnie Brand and/or Rahiim Muhammad would testify that Fryer was involved in a disagreement over stolen marijuana and intended to harm Fitzgerald. On August 10, 2016, the trial court held a KRE 404(b) hearing to address Brand's testimony. Once it was revealed that Brand did not know why Fryer shot the victim, the Commonwealth withdrew its KRE 404(b) notice as to Brand.

On August 11, 2016, the trial court held a KRE 404(b) hearing for Muhammad's testimony. Muhammad told the court the information he knew about Brand and Fryer. After Muhammad's testimony and questions from the trial court, the Commonwealth withdrew its KRE 404(b) notice and counsel stated that he would not ask Muhammad about what may have led up to the crimes. All that remained for Muhammad's testimony was the alleged confession Fryer made to him, while they were incarcerated together.

The defense objected that allowing Muhammad to testify would constitute a *Brady* violation.[4] In response, counsel for the Commonwealth stated that he had notified the defendant in February, nearly six months prior, of the possibility of Muhammad's testimony. The defense counsel responded

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

10

that although he knew about Muhammad in February, he was never told what Muhammad's testimony would be. No recorded statements of any kind had been made, and Muhammad had not spoken to the police. Also, some confusion existed because there were two potential informants in this case — Muhammad and David Mason — who provided information about Brand.

To eliminate confusion, the trial court reviewed the record and determined that six months earlier, on February 19, the Commonwealth disclosed Muhammad's identity, the circumstances where the confession occurred, and the substance of what his testimony would be.[5] Being satisfied that the Commonwealth complied with Rules of Criminal Procedure (RCr) 7.24 and that the defense had ample time to prepare for the trial testimony, the trial court determined that Muhammad would be permitted to testify.

Fryer immediately made an oral motion for a continuance to prepare for Muhammad's testimony. Defense counsel stated that whether the Commonwealth would introduce Muhammad's testimony was always speculative and he needed time to talk to Fryer and investigate. In response, the trial court stated that the availability of witnesses is always subject to change and that the defense had ample time to prepare. Additionally, while it was impossible to know whether Muhammad would actually come forward and testify, everyone was on notice that it was a possibility. The motion for a

---

[5] The trial record from the Hardin Circuit Clerk's Office did not include any hearings from February 19, 2016. However, the trial court discussed the events that transpired and the substance of the hearing on the record on August 11, 2016.

11

continuance was denied and Muhammad took the witness stand shortly thereafter.

### A. The Trial Court Did Not Abuse Its Discretion in Allowing Rahiim Muhammad to Testify.

RCr 7.24 states that "[u]pon written request by the defense, the attorney for the Commonwealth shall disclose the substance, including time, date, and place, of any oral incriminating statement known by the attorney for the Commonwealth to have been made by a defendant to any witness." The Commonwealth's obligation to disclose incriminating statements informs the defendant of the statements he allegedly made, and also informs the defendant that the Commonwealth knows of those statements. *Chestnut v. Commonwealth*, 250 S.W.3d 288, 297 (Ky. 2008). A trial court's ruling on discovery issues, such as failure to comply with RCr 7.24, is reviewed for abuse of discretion. *Hilton v. Commonwealth*, 539 S.W.3d 1, 9 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

In addition to RCr 7.24, Fryer also briefly cites to RCr 7.26(1) in his argument, but this rule only applies to written or recorded statements. Since Muhammad did not make any written or recorded statements, this rule does not apply. Additionally, although Fryer claims he was prejudiced by not knowing that the Commonwealth met with Muhammad approximately two weeks prior to trial, no statement was recorded or new information revealed during that meeting that would give rise to any new discovery obligations.

12

The record reflects that Muhammad's name and potential appearance as a witness was initially discussed in late February 2016. Further, the Commonwealth stated that defense counsel contacted the Commonwealth repeatedly around the beginning of June 2016 and asked for Muhammad's recorded statements. The Commonwealth followed up with counsel and told him that no recorded statements had been made and that the Commonwealth only knew that Muhammad would testify that Fryer confessed to shooting Fitzgerald.

To trigger the disclosure obligation, RCr 7.24(1) only requires that the attorney for the Commonwealth know of the statement and not that the statement be recorded. *Chestnut,* 250 S.W.3d at 296. The concept of RCr 7.24(1) is thus very simple. Any incriminating statements made by the defendant to a witness must be disclosed. Although Fryer attempted to get more details, the Commonwealth turned over all information known to it about Muhammad, his anticipated testimony, and the circumstances surrounding Fryer's alleged incriminating statement.

Further, Fryer was given an opportunity to cross-examine Muhammad about the alleged incriminating statements and to question Brand about whether he made statements to Muhammad. The defense recalled Brand to testify and he was adamant that he had not told Muhammad that he set Fitzgerald up. (Brand, Muhammad and Fryer were all incarcerated together at one time.) Brand also testified that Muhammad read Fryer's discovery and was testifying as a way to get out of jail. The jury was able to assess the credibility

13

of both Muhammad and Brand and could weigh their testimony when deliberating.

Even if this Court were to consider the Commonwealth's disclosure of intent to call Muhammad as a witness and the nature of his testimony to be untimely, when an untimely disclosure is made, the inquiry is whether the defendant was prejudiced by the late disclosure, not by the statement itself. *Clutter v. Commonwealth*, 322 S.W.3d 59, 65 (Ky. 2010). Here the defense was not prejudiced because Fryer knew in February, nearly six months before trial, that Muhammad was a potential witness and the nature of his intended testimony. The trial court granted a continuance in part to give Fryer more time to investigate Muhammad and develop a defense theory.[6] Although the substance of Muhammad's testimony may be considered prejudicial, Fryer had ample time to investigate Muhammad, anticipate what his testimony would be, and adequately prepare.

In sum, the Commonwealth did not violate RCr 7.24 because the possibility of Muhammad's testimony, including the substance of Fryer's statement, was disclosed as soon as the Commonwealth knew about it.

---

[6] The trial court record indicated that on February 22, 2016, when trial was scheduled to begin, Fryer cited to both the recent interview with Brand and the recent discovery that Muhammad was a potential witness when he requested a continuance. When the trial court granted the continuance, the judge noted Muhammad's testimony was not a major issue in his opinion, and that there was no way to know whether his testimony would actually be introduced at trial. In granting the continuance, the trial court focused on the importance of Fryer's opportunity to review the Brand interview and prepare for trial accordingly, as well as the judicial economy in waiting for Brand to be indicted.

14

Therefore, the trial court did not abuse its discretion in allowing the testimony at trial.

## B. The Trial Court Did Not Abuse Its Discretion in Denying Fryer's Motion for a Continuance.

In the alternative, Fryer argues that the trial court erred in denying his oral motion to continue the trial for one day in order to give counsel time to prepare for Muhammad's testimony. The trial court's ruling on a motion for a continuance is reviewed for abuse of discretion. *Montgomery v. Commonwealth,* 320 S.W.3d 28, 47 (Ky. 2010).

"[A] conviction will not be reversed for failure to grant a continuance unless that discretion has been plainly abused and manifest injustice has resulted." *Parker v. Commonwealth,* 482 S.W.3d 394, 402 (Ky. 2016). When ruling on a continuance motion, the trial court should consider the following elements: "length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice." *Snodgrass v. Commonwealth,* 814 S.W.2d 579, 581 (Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth,* 53 S.W.3d 534 (Ky. 2001).

One of the factors weighing most heavily against Fryer's argument is previous continuances. On February 22, 2016, the trial court granted a continuance and scheduled a status conference for March 22, 2016, to determine a trial date. While the judge's reasoning for granting the continuance was primarily to allow counsel time to review an interview with

Brand, defense counsel also stated that he just learned about Muhammad forty-eight hours prior and wanted time to prepare the defense theory. At the March 22, 2016 status conference, the trial court ultimately scheduled the trial for August 10, 2016, which effectively provided all parties even more time to prepare for Muhammad's testimony.

Granting a continuance, even for one day, would have caused inconvenience. The motion was made after the jury was assembled, and the Commonwealth was ready to proceed with its first witness. Further, although there may have been prejudice to Fryer as a result of the substance of Muhammad's testimony, the trial court reiterated that the defense had ample time to prepare for the possible testimony and we agree. Moreover, as we stated in *Bartley v. Commonwealth*, 400 S.W.3d 714, 733 (Ky. 2013), "[c]onclusory or speculative contentions that additional time might prove helpful are insufficient." Fryer offered no particular reason why denial of a one-day continuance would prejudice his case and, in fact, he had six months to prepare for Muhammad's testimony.

Having considered Fryer's arguments and the record, we find no abuse of discretion in the trial court's denial of Fryer's motion for a continuance.

**III. The Trial Court Did Not Palpably Err in Allowing the Testimony of Lonnie Brand or the Commonwealth's Closing Argument Referring to That Testimony.**

Brand testified that he entered a plea deal in exchange for his testimony at Fryer's trial. During direct examination, the following exchange occurred between the Commonwealth (CW) and Brand (LB):

16

CW:     Now, you were offered a plea bargain to testify today, weren't you?

LB:     Correct.

CW:     And part of that plea bargain is you actually agreed to tell the truth, right?

LB:     Yes.

CW:     And the judge is the fact finder whether you tell the truth, correct?

LB:     Correct.

CW:     And if the judge finds that you've told the truth then your actual recommendation is that you be probated, right?

LB:     Correct.

CW:     And if not then you'd have to serve quite a bit of time, right?

LB:     Correct.

CW:     So obviously you have lots of incentive to tell the truth today, right?

LB:     Yes, correct.

CW:     You don't really want to be here, you don't want to be labeled as someone who snitches, right?

LB:     Right, I just wanted to take my plea and get on my way.

CW:     But at some point you recognized you gotta do what's best for you, right?

LB:     I mean, telling ain't what's best for me but either way it goes, you know, I took a plea and I'm guilty and basically that's it.

CW:     Are you telling the truth today?

LB:     Yes.

During closing argument, the prosecutor stated:

> Lonnie says he's there. Nobody forced him to say it. His plea is he has to tell the truth . . . . The judge decides what the truth is, the Commonwealth does not decide what the truth is. The judge decides the punishment. There's a reason that the plea says that, because I don't want him to come in and say that guy told me to do this or else. That's not the case, that's not how it works, we can't do that. Lonnie was there. He was a participant but he got a deal because he was not the one who shot [Fitzgerald] and not the one who benefited from the proceeds of the robbery.

Fryer argues that Brand's testimony about his plea deal was improperly admitted and that the Commonwealth's closing argument constituted impermissible vouching that assured the jury that Brand was being truthful.

17

Neither issue regarding Brand's testimony is preserved and we therefore review for palpable error under RCr 10.26. A trial court will be reversed for palpable error when "manifest injustice has resulted from the error." *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012). This Court has explained that manifest injustice has resulted if the error "so seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009) (citations omitted). "[A] palpable error affects the substantial rights of a party only if it is more likely than ordinary error to have affected the judgment." *Kiper v. Commonwealth*, 399 S.W.3d 736, 747 (Ky. 2012) (citations omitted).

Fryer cites *Tipton v. Commonwealth*, 640 S.W.2d 818 (Ky. 1982), in support of his argument that Brand should not have testified about his plea deal. In *Tipton* this Court stated:

> It has long been the rule in this Commonwealth that it is improper to show that a co-indictee has already been convicted under the indictment. To make such a reference and to blatantly use the conviction as substantive evidence of guilt of the indictee now on trial is improper . . . .

*Id.* at 820 (citation omitted). In that case, the Commonwealth repeatedly elicited testimony regarding a co-indictee's guilty plea in an attempt to prove the guilt of Tipton, the defendant then on trial. However, in Fryer's case, the Commonwealth elicited testimony from Brand about his guilty plea to show Brand's incentive for testifying truthfully, and then his substantive testimony only placed Fryer at the scene. On direct examination, Brand stated that he

18

originally told the police he did not know who shot Fitzgerald, but then stated it was likely Fryer since he was at the scene. On re-direct he stated that he did not see Fryer pull the trigger; he just knew he was at the scene.

Even if the trial court erred in allowing testimony regarding Brand's plea agreement, Brand's testimony was merely cumulative of other evidence presented at trial. Brand's account of the events was similar to testimony provided by Fitzgerald, the victim, who actually knew Fryer, although not his correct name. Like Brand, Fitzgerald and Muhammad also provided testimony that placed Fryer at the scene.[7] When a trial court erroneously admits cumulative evidence, the error is generally harmless. *Torrence v. Commonwealth*, 269 S.W.3d 842, 846 (Ky. 2008). In any event, palpable error is our most stringent standard and we cannot say Brand's testimony regarding his plea deal caused a manifest injustice.

Finally, Fryer insists, rather inartfully, that the Commonwealth's closing argument, quoted above, resulted in the prosecutor vouching for Brand's credibility. "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of [the prosecutor's office] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). The Commonwealth did not vouch for Brand's credibility but instead pointed out

[7] Muhammad testified that while they were incarcerated together Fryer admitted to shooting Fitzgerald which, as a result, placed Fryer at the scene of the crime.

19

that the judge would decide when sentencing Brand whether he had offered truthful testimony. Later, the trial judge expressly told the jury that he — the judge — does not determine the credibility of witnesses at trial and that anything the attorneys say is not evidence. In these circumstances, the Commonwealth did not improperly vouch for a witness's credibility and no error, certainly no palpable error, occurred.

## IV. The Trial Court Did Not Abuse Its Discretion in Admitting the Photo Lineup and Out-of-Court Identification.

In the afternoon on the day the shooting occurred, Detective Mattingly and Sergeant Fitzpatrick interviewed Fitzgerald in his hospital room. Detective Mattingly testified that during his interview, Fitzgerald was initially hesitant to state who shot him out of fear for the safety of himself and his family, and possible prosecution against him because of the actual reason for going to meet Brand that night, a marijuana deal. Fitzgerald requested witness protection several times.

During the interview Fitzgerald stated that he recognized Fryer immediately. Additionally, he stated that there was adequate lighting and Fryer was close enough to Fitzgerald for him to be able to see him clearly. In his testimony, Detective Mattingly testified that he recalled Fitzgerald stating that the perpetrator was an African-American male with dreadlocks and used a Glock. While it does not appear from the record that Fitzgerald offered a detailed description of the perpetrator, Fitzgerald gave the perpetrator's name relatively early in his interviews with the police.

20

In one of the recorded police interviews, Fitzgerald referred to "the Gregorys." He proceeded to describe the event and said, "he came around." The officer asked who "he" was, to which Fitzgerald replied "Warren." Fitzgerald was the first person to bring up the name "Warren." He later explained that he thought Warren was a Gregory. The officers then asked whether Fitzgerald believed he could identify the victim and Fitzgerald confidently said he could.

The officers had a six-pack photo lineup that included Fryer generated and expedited by Kentucky State Police. The lineup contained photos of six African-American men with dreadlocks and did not display any identifying information. Sergeant Kirkpatrick read a standard photo identification form to Fitzgerald, told him that the perpetrator may or may not be in the lineup, and said he should not feel compelled to make an identification. Sergeant Kirkpatrick also told Fitzgerald that it was just as important to exclude innocent persons as it was to identify the suspect, and that their investigation of the crime would continue even if Fitzgerald did not make an identification. Without hesitation Fitzgerald identified photo number five, which was the photo of Fryer. Fitzgerald circled, initialed and dated the identification.

Fryer made a motion to suppress the out-of-court photo identification prior to trial. Finding that the photo lineup was not unduly suggestive, the trial court denied the suppression motion and admitted the out-of-court identification.

21

"We review a trial court's ruling on a motion to suppress an out-of-court identification, as we do a ruling regarding the admissibility of any evidence, for an abuse of discretion." *Crutcher v. Commonwealth,* 500 S.W.3d 811, 816 (Ky. 2016). The trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945. Determining whether identification testimony violates a defendant's due process rights requires a two-step process. *Dillingham v. Commonwealth,* 995 S.W.2d 377, 383 (Ky. 1999). First, the court examines the pre-identification encounters to determine whether they were unduly suggestive. Even if the encounters were unduly suggestive, the second step in the analysis asks whether "under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive." *Id.,* quoting *Stewart v. Duckworth,* 93 F.3d 262, 265 (7th Cir. 1996).

In the present case, the pre-identification encounters were not suggestive. Fitzgerald was the first one to say the name "Warren," not the officers, and this led to the conclusion that a photo of Warren Fryer should be included in the photo array. While the identification was not videotaped, the officer who presented the photo lineup testified that he did not insinuate, by words or action, which photo Fitzgerald should select. Sergeant Kirkpatrick also testified that while any officer could have presented the lineup, he chose to do it because he did not know Fitzgerald or Fryer and felt that he was a "neutral presence."

22

The Court notes that the photo of Fryer in the lineup has a darker background than the other five photos. In this regard, Fryer's photo stands out to some extent. However, Fryer's photo does not stand out to the point that the identification process was unduly suggestive. In *Oakes v. Commonwealth*, 320 S.W.3d 50, 57 (Ky. 2010), this Court held that a photo lineup was not impermissibly suggestive when the photo of Oakes was of higher resolution than the other photos. In that case, the other photos lacked proper gradation and appeared to be brighter than the photo of Oakes. Even though this Court conceded that Oakes's photo stood out to some extent, given that Oakes's features resembled the other participants and the quality of the photos was not so different as to prevent reasonable consideration of the other photos, we held the trial court properly admitted the out-of-court identification. *Id.* at 57-58. Even though the background of Fryer's photo is slightly darker than the other photos, it did not prevent reasonable consideration of the other photos. While it can be argued that Fryer's photo stands out slightly, Fryer's features resembled the other participants. Therefore, the photo lineup was not impermissibly suggestive to an extent that would increase the likelihood of misidentification.

It bears emphasis that Fitzgerald gave the police Fryer's name "Warren," which prompted the creation of a photo lineup containing Fryer. This differs from when a victim merely provides a description of a perpetrator. Further, Fitzgerald testified that he knew Fryer from the neighborhood, that he had

23

given him a ride before, and that he told the police officers with confidence that he would be able to identify the perpetrator.

Even if this Court were to find that the photo lineup was impermissibly suggestive, Fryer's argument would fail under the next step in the analysis. When determining if the identification was reliable under the totality of the circumstances, a reviewing court must consider:

> [1] the opportunity of the witness to view the criminal at the time of the crime; [2] the witness' degree of attention; [3] the accuracy of the witness' prior description of the criminal; [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

In the present case, Fitzgerald testified that the lighting was sufficient, and that Fryer was close enough to him for him to see clearly. Fryer reached into Fitzgerald's pockets, which supports the contention that Fitzgerald had a good opportunity to look at his assailant. He also stated that he recognized Fryer immediately. Certainly, Fitzgerald had a good opportunity to view Fryer at the time of the crime. Next, considering that Fryer was pointing a gun at Fitzgerald, it is likely that Fitzgerald was paying close attention to Fryer, as opposed to being a "casual observer." *Moore v. Commonwealth*, 569 S.W.2d 150, 153 (Ky. 1978). As to the third factor, although Fitzgerald did not provide much of a physical description of his assailant, he indicated that he recognized Fryer immediately as he emerged on the night of the shooting. Fitzgerald demonstrated certainty that Fryer was the perpetrator as evidenced by his immediate recognition of Fryer, and his confidence that he would be able to

24

identify his assailant in a photo lineup. Lastly, the shooting occurred in the early morning hours of August 6, 2016, and Fitzgerald identified Fryer in the lineup when it was presented to him a mere day later on August 7, 2016, which is a short window of time between the incident and the identification. Under the totality of the circumstances, Fitzgerald's identification of Fryer was reliable.

On appeal, Fryer argues specifically that the photo lineup was unduly suggestive because the lineup should have contained a photo of one of the Gregorys, since Fitzgerald was confused and thought Gregory was Warren's last name. This argument is extremely weak. Although Fitzgerald initially said the surname Gregory, he later clarified that at the time of the incident he believed Warren was a Gregory. Even after Fitzgerald gave the surname Gregory, soon after he said the first name Warren. There is no evidence that the police or anyone else suggested that Warren Fryer was the perpetrator. Detective Mattingly stated that he only learned that Fryer was a suspect after interviewing and obtaining information from Fitzgerald. Additionally, Detective Mattingly testified that Fitzgerald told him that Fryer was related to the Gregorys or at least was always around them in the neighborhood, which could explain Fitzgerald's initial confusion. Considering that there was no identifying information on the photo lineup, for all Fitzgerald knew, all of the photos could have been photos of Gregorys or none of them could have been.

The officer who presented the photo lineup followed standard procedure and gave Fitzgerald several disclaimers prior to introducing the photos. The

25

men in the photos all shared similar characteristics, and the fact that no Gregory was in the lineup is immaterial. Fitzgerald was confident in his opportunity to view the perpetrator and immediately identified Fryer from the lineup. Given the testimony of Fitzgerald and the officers, and the procedures employed when presenting the lineup, we are satisfied that the trial court did not abuse its discretion in determining that the photo lineup was not unduly suggestive and therefore admissible.

## **CONCLUSION**

For the foregoing reasons, we affirm the trial court's conviction and judgment.

All sitting. All Concur.


COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General

26