# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2018-SC-000189-MR

DATE 11|25|19 JHF

SHANE VANWILLIAMS                                              APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                  HONORABLE ANGELA MCCORMICK BISIG, JUDGE
NO. 16-CR-002519

COMMONWEALTH OF KENTUCKY                                       APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Shane VanWilliams appeals as a matter of right from the Jefferson Circuit Court judgment sentencing him to life in prison without parole for 25 years for murder and first-degree robbery. On appeal, VanWilliams argues that the trial court erred by denying his *Batson* motion,[1] by failing to grant his motion for directed verdict on the robbery charge and by erroneously instructing the jury. Finding no error, we affirm the trial court.

### FACTS AND PROCEDURAL HISTORY

According to the Commonwealth, VanWilliams and Dion Cummings, both drug dealers, conspired to rob Joseph Key, who was also a drug dealer, of

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

a large quantity of heroin.[2] Approximately one month before the murder, VanWilliams asked Cummings about robbing Key, but Cummings did not believe VanWilliams was serious. At 5:13 p.m. on August 20, 2016, Cummings sent VanWilliams a message stating "let me no get dat ill du everything else." Cummings, VanWilliams, and Key exchanged a few messages and calls throughout that afternoon. VanWilliams called a cab company at 9:47 p.m. using a fake name and asked to be taken to Key's apartment building. VanWilliams and Key never communicated directly, but instead communicated through Cummings. Between 10:15 p.m. and 11:30 p.m., Key and Cummings and Cummings and VanWilliams had a few phone conversations.

Around 11:27 p.m. Key pulled up to the pumps at a gas station and Cummings got in his vehicle.[3] According to Cummings's trial testimony, Key showed him seven grams of heroin, advised he had to go pick up some more, and that he had to make a drop before finally going home. Cummings then sent a message to VanWilliams which stated "Bro he re b hme he jus calld me

---

[2] Initially, Cummings entered a "not guilty" plea, but ultimately entered a plea agreement with the Commonwealth in which he agreed to the following facts:

> On or about August 21, 2016 in Jefferson County KY [Cummings] knowingly provided information to Shane VanWilliams which aided and enabled him to use physical force with a deadly weapon to accomplish a theft of Joseph Key.

In exchange for his guilty plea and testimony at VanWilliams's trial, the Commonwealth agreed to recommend a five-year sentence on the robbery charge and to not oppose Cummings seeking dismissal of the murder charge. The murder charge was dismissed, and Cummings was sentenced in accordance with the plea agreement.

[3] The exact time Cummings met Key at the gas station is unclear from the record. Surveillance video and its time stamp show a person entering Key's vehicle at 11:29 p.m. Cummings testified that he sent a message to VanWilliams at 11:27 p.m. after he exited Key's vehicle.

n he gt a zip of h I need dat." Cummings explained that a "zip of h" means an ounce of heroin, which he estimated was worth $2,400. He explained that "I need dat" meant "I need what you owe me." Apparently, Cummings fronted drugs for VanWilliams. Cummings explained that if he "fronted" products for someone, that person sells the products and then would either bring Cummings cash or drugs to settle the debt after selling the drugs to a customer. The Commonwealth's theory was that VanWilliams planned to rob Key of the heroin, then pay his debt to Cummings. At 11:37 p.m., Cummings called VanWilliams and the conversation lasted nine minutes.

Around midnight, Key went to one of his client's apartments for her to sample heroin. She testified that she and Key were friends and that he trusted her and wanted her honest opinion about the quality of the heroin. After using half of an ounce of heroin, she told Key it was subpar. According to her trial testimony, Key stayed for about 30 minutes then left. At 12:10 a.m., Key sent Cummings a text message. Cummings called VanWilliams at 12:21 a.m. At 1:06 a.m., VanWilliams called the same cab company, using a different cell phone and a fake name, and asked to be picked up at a Burger King, which was a short distance from Key's apartment, and taken to an address where Cummings was staying at the time.

According to Cummings, VanWilliams showed up around 2:00 a.m. In line with his trial testimony that he was merely trying to set up a drug deal between Key and VanWilliams so he could recover money for drugs he fronted, Cummings testified that he was upset when VanWilliams told him that Key had

3

been shot. Not knowing anything about this, and getting a "bad vibe" from VanWilliams, Cummings told him to leave.

At 8:00 a.m. on August 21, 2016, a call to 911 was placed and authorities responded to Key's apartment, where his body was found. He was shot in the head from three to four feet away and had no defensive wounds on his body.[4] The door to the apartment was slightly ajar and swung inward. The evidence suggested that the door was closed when Key was shot. In the weeks after the murder, police found a water bottle behind Key's apartment containing VanWilliams's DNA, boot prints outside of the apartment, and one of VanWilliams's cell phones in a grassy area nearby.

VanWilliams was stopped by police in Norfolk, Virginia, on November 9, 2016. He provided a fake name. When police searched VanWilliams and his belongings they found nearly $2,000 in cash, three pairs of boots, a handgun with Key's blood and a bus ticket from Louisville to New York with a departure date the day after the murder. Further examination of the handgun and a casing found in Key's apartment revealed that the gun in VanWilliams's possession was the one that killed Key.

VanWilliams testified at trial and told a different version of events. VanWilliams stated that he was interested in selling heroin and asked Cummings if he knew anyone who he could buy from. Cummings served as a middle man between VanWilliams and Key and arranged for them to meet at

_____

[4] This evidence was introduced by the pathologist that conducted Key's autopsy.

4

Key's apartment. VanWilliams took a cab to the apartment and waited for Key for approximately two hours. He stated that when Key arrived, he followed Key into his apartment and Key instructed him to wait in the front room while he went into the back. Soon after, Key told VanWilliams to come to the back room where Key revealed he had seven grams of heroin.

Despite negotiation attempts, the two could not agree on a price and VanWilliams stated that Key became agitated and demanding. VanWilliams testified that he felt tension building and attempted to leave the apartment. As he walked toward the door, Key grabbed him and turned him around. VanWilliams lifted his shirt to show Key that he had a gun. VanWilliams testified that Key lunged for the gun and pushed him down. As the two went to the floor, VanWilliams lost possession of the gun and it fell to the side. The two wrestled for a moment, until VanWilliams got out from underneath Key, grabbed the gun and shot him. VanWilliams claimed that he feared for his life. After shooting Key, VanWilliams exited the apartment through the back window. Although VanWilliams claimed he had no intent to rob Key, he admitted that he brought a loaded gun to meet Key and had an extra clip. On August 22, 2016, VanWilliams took a bus to New York and later went to Virginia.

On appeal, VanWilliams argues that the trial court erred (1) by denying his *Batson* motion; (2) by failing to grant a motion for directed verdict as to robbery; (3) by failing to include an extreme emotional disturbance instruction; and (4) by failing to properly instruct the jury regarding the aggravator.

5

## I.  The trial court did not err in denying the *Batson* motion.

After the parties exercised their peremptory challenges, defense counsel asked the Commonwealth for its race-neutral reasons for striking Juror A, an African-American male. The Commonwealth stated that Juror A was a party in a discrimination lawsuit and that his birth state was New York. The Commonwealth was concerned that Juror A would be apt to give more credence to VanWilliams, a New York native, whose nickname was "New York" and whose cellphones, which would be used at trial, had New York area codes. The Commonwealth stated that the nickname "New York" was a crucial element of the case, and Juror A was the only member of the panel born in New York. Additionally, VanWilliams fled to New York after the crime. After the Commonwealth provided its race-neutral reasons for the strike, the trial court allowed VanWilliams to respond, but counsel stated that he would "let the record speak for itself."

The trial court accepted the Commonwealth's race-neutral reasons and denied the *Batson* motion. The trial court based its decision on Juror A being a New York native, rather than his association with a discrimination lawsuit. The trial court acknowledged the Commonwealth's concern that Juror A's association with or affinity for New York might factor in if he sat on a jury where an overwhelming number of people are from Kentucky and the defendant was also a New Yorker. VanWilliams argues that the trial court erred in denying his *Batson* motion. We disagree.

6

In *Batson*, the United States Supreme Court set forth a three-step process for determining whether peremptory strikes were used to strike jurors on the basis of race in violation of the Equal Protection Clause:

> First, the defendant must make a prima facie showing of racial bias for the peremptory challenge. Second, if the requisite showing has been made, the burden shifts to the Commonwealth to articulate clear and reasonably specific race-neutral reasons for its use of a peremptory challenge. While the reasons need not rise to the level justifying a challenge for cause, self-serving explanations based on intuition or disclaimer of discriminatory motive are insufficient. Finally, the trial court has the duty to evaluate the credibility of the proffered reasons and determine if the defendant has established purposeful discrimination. A judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact.

*Gamble v. Commonwealth*, 68 S.W.3d 367, 371 (Ky. 2002) (quotations and citations omitted). A trial court's denial of a *Batson* motion is reviewed for clear error. *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000).

This Court has determined that once the Commonwealth offers race-neutral reasons for the peremptory strike and the trial court has ruled on the discrimination issue, then the first step in the analysis — the defendant's *prima facie* showing of racial bias — is moot. *Gamble*, 68 S.W.3d at 371. Here the Commonwealth provided race-neutral reasons for striking the juror subject to the *Batson* motion, rendering the first prong of the analysis moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

The second prong of the test requires the Commonwealth to provide "clear and reasonably specific" race-neutral reasons for the peremptory strikes. *Id.* The Commonwealth stated that Juror A was involved in a discrimination

7

lawsuit and had ties to New York. The second step of the *Batson* analysis does not require the Commonwealth's reasons for exercising a peremptory strike to be persuasive or plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). This step is a "fairly low bar for the Commonwealth to meet." *Mash v. Commonwealth*, 376 S.W.3d 548, 555 (Ky. 2012). Here the facial validity of the Commonwealth's explanation is assessed and, unless discriminatory intent is inherent in the justification for the strike, the proffered reasons will be deemed race-neutral. *Hernandez*, 500 U.S. at 360. Because there is no discriminatory intent inherent in the Commonwealth's explanations for striking Juror A, the second prong of the *Batson* analysis is satisfied. *Id.*

In the third step of the *Batson* analysis, the burden shifts back to the party challenging the strike to prove "purposeful discrimination." *Id.* at 359. Here the trial court must determine whether the Commonwealth's reasons behind exercising the strikes were merely a pretext for racial discrimination. *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky. 2007). Since this is comparable to a finding of fact, the trial court must be afforded great deference. *Id.* This step requires the trial court to assess the credibility and demeanor of the attorneys. *Commonwealth v. Coker*, 241 S.W.3d 305, 308 (Ky. 2007).

In *United States v. Chandler*, 12 F.3d 1427, 1432 (7th Cir. 1994), the Seventh Circuit Court of Appeals held that the use of a peremptory challenge to strike an African-American juror because he resided in the same area as the defendant was a sufficient race-neutral reason. Although, as VanWilliams points out, no one asked Juror A if he was from New York City, like

8

VanWilliams, we think the geographical reason for the strike is even more acceptable in a case like this, where the state of New York is relevant in more than one way. VanWilliams criticizes the Commonwealth's failure to ask any questions about venire members' native states, but this information was available to all parties via the juror qualification forms. Additionally, to have a New York native on trial in a Kentucky court with another New York native on the jury panel was unusual. The Commonwealth was justified in its concern that a New York native serving on a Kentucky jury could have been biased in favor of a New York criminal defendant.

"In absence of exceptional circumstances," appellate courts should defer to the trial court in the third step of the analysis. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). The Commonwealth's reasons for striking Juror A were specific and clear, despite VanWilliams's assertion to the contrary. Importantly, the New York connection was also an objective fact, not a vague gut feeling or matter of alleged personal knowledge like the reasons found wanting in *Johnson v. Commonwealth*, 450 S.W.3d 696 (Ky. 2014). Here, the trial court carefully considered the proffered reasons and determined that the Commonwealth's rationale for exercising the juror strike was race-neutral and satisfactory. Because VanWilliams has failed to prove purposeful discrimination, we hold that the trial court's denial of the *Batson* challenge was proper.

## II. The trial court did not err in denying the motion for directed verdict on the robbery charge.

At the close of the Commonwealth's case, VanWilliams moved for directed verdict of acquittal as to both the murder and robbery charges. He argued that no reasonable juror could return a guilty verdict, even considering the evidence in a light most favorable to the Commonwealth. The Commonwealth argued that there was ample evidence, including Cummings's testimony and the fact that the heroin was never found in Key's apartment, to send the case to the jury. The trial court determined that sufficient evidence was presented and denied the motion. On appeal, VanWilliams argues that the trial court erred in failing to grant a directed verdict on the robbery charge, and that the Commonwealth did not present evidence that he actually committed a theft.

A trial court's ruling on a motion for directed verdict is reviewed using the following standard:

> When presented with a motion for a directed verdict, a court must consider the evidence as a whole, presume the Commonwealth's proof is true, draw all reasonable inferences in favor of the Commonwealth, and leave questions of weight and credibility to the jury. The trial court is authorized to grant a directed verdict if the Commonwealth has produced no more than a mere scintilla of evidence; if the evidence is more than a scintilla and it would be reasonable for the jury to return a verdict of guilty based on it, then the motion should be denied. *Id.* On appellate review, the standard is slightly more deferential; the trial court should be reversed only if it would be *clearly unreasonable* for a jury to find guilt.

*Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013) (citations omitted).

10

We recognize that the evidence produced by the Commonwealth was not conclusive. However, the Commonwealth presented sufficient evidence at trial to allow a reasonable juror to find guilt, especially given the deference afforded to the trial court upon appellate review: (1) Cummings testified that approximately one month prior to the murder VanWilliams asked him about robbing Key; (2) Cummings met with Key prior to the murder and Key informed him that he had seven grams of heroin and was going to pick up more before going home; (3) after exiting Key's vehicle, Cummings sent VanWilliams a message stating that Key would soon be on his way home with an ounce of heroin and Cummings stated "I need dat"; (4) after sending the message about the heroin, Cummings continued to communicate with Key and VanWilliams; (5) police recovered seven grams of heroin in Key's apartment, but did not find the zip of heroin that Cummings told VanWilliams that Key would have; (6) after shooting Key, VanWilliams (using a fake name) took a cab from a Burger King near Key's apartment and went to see Cummings; (7) VanWilliams then fled to New York.

"It should be remembered that the trial court is certainly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). Here, the proof, and reasonable inferences that could be made therefrom, allowed the jury to reasonably believe the Commonwealth's theory that Cummings and VanWilliams conspired to rob Key — that VanWilliams waited at Key's apartment while Cummings kept him informed of his

11

whereabouts; ambushed Key, shot him, robbed him of the ounce of heroin Cummings advised he would have; met Cummings after the robbery; and then fled to New York. Given the evidence presented, the trial court did not err in denying the motion for directed verdict.

### III. The trial court properly instructed the jury on extreme emotional disturbance (EED).

VanWilliams argues that the evidence suggested there was a "suddenly triggered emotional disturbance" caused by Key which led VanWilliams to shoot him. He argues that his conviction for murder should be reversed because the trial court failed to instruct the jury on first-degree manslaughter under an EED theory. The relevant jury instructions were as follows:

### INSTRUCTION NO. 1 MURDER (Intentional)

You will find the Defendant, Shane VanWilliams, guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in Jefferson County, Kentucky, on or about the 21st day of August, 2016, the Defendant killed Joseph Key by shooting him;

AND

(B) That in so doing , the Defendant intentionally caused the death of Joseph Key;

AND

(C) That the Defendant was not privileged to use self-protection as set out in Instruction 1A;

AND

(D) That the Defendant was not acting under the influence of extreme emotional disturbance as set out in Instruction 8.

12

## INSTRUCTION NO. 1A SELF-PROTECTION

Even though the Defendant, Shane VanWilliams, might otherwise be guilty of Murder under Instruction No. 1 or 2, if at the time the Defendant killed Joseph Key, he believed that Joseph Key was then and there about to use physical force upon him, he was privileged to use such physical force against Joseph Key as he believed to be necessary in order to protect himself against it, but including the right to use deadly physical force in so doing only if he believed it to be necessary in order to protect himself from death or serious physical injury at the hands of Joseph Key, and subject to these qualifications: see Instruction 1B.

## INSTRUCTION NO. 1B WANTON OR RECKLESS BELIEF QUALIFICATION

Regardless of what the Defendant, Shane VanWilliams, then believed, if you believe from the evidence beyond a reasonable doubt that it was not in fact necessary for him to use any physical force against Joseph Key in order to protect himself from death or serious physical injury, or if it was, he used more physical force than was actually necessary to protect himself from death or serious physical injury, you shall consider whether the Defendant is guilty of Manslaughter in the Second Degree under Instruction 4 or Reckless Homicide under Instruction 5.

The verdict form for Instruction 1 allowed the jury to find VanWilliams guilty or not guilty, and further stated:

If you find the defendant, Shane VanWilliams, guilty under Instruction 1, you will say so by your verdict and no more. There will be a further proceeding at which you will fix his punishment. If you find the defendant, Shane VanWilliams, not guilty under Instruction 1, you shall proceed to Instruction 2.

Finally, as referenced in Instruction 1, the trial court included an instruction on EED:

13

## INSTRUCTION NO. 8 EXTREME EMOTIONAL DISTURBANCE

Extreme Emotional Disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the Defendant's situation under the circumstances as the Defendant believed them to be.

The instruction for first-degree manslaughter did not contain a provision regarding EED. On appeal, VanWilliams argues that this constituted error. VanWilliams acknowledges that this issue is unpreserved and requests review for palpable error pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26. Palpable error review requires reversal when "manifest injustice has resulted from the error." *Elery v. Commonwealth*, 368 S.W.3d 78, 98 (Ky. 2012) (quoting RCr 10.26). In determining whether there has been manifest injustice, the Court focuses "on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

Under Kentucky Revised Statute (KRS) 507.030(1)(b), a person is guilty of first-degree manslaughter when "[w]ith the intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance . . . ." This Court has held that

14

> evidence of EED entitles the Murder defendant to an instruction on the lesser included offense of first-degree manslaughter because the murder and first-degree manslaughter statutes go hand in hand. Under the murder statute, if one commits the act while not under the influence of EED, he is guilty of murder. Under the manslaughter statute, if he does the same act while under the influence of EED, he is guilty of manslaughter in the first degree. Thus, depending on the finding of the jury with respect to the absence or presence of EED, the same act may justify a conviction of murder or a conviction of manslaughter.

*Holland v. Commonwealth*, 114 S.W.3d 792, 805 (Ky. 2003).

In this case, the trial court noted that it was including EED in the jury instructions "by the thinnest of margins." VanWilliams is correct that while the trial court included an instruction on EED, it did not provide a way by which the jury could find him guilty under an EED theory. However, this issue is reviewed for palpable error and we cannot say that the defect resulted in manifest injustice.

"The jury is presumed to follow any instruction given to them. We must presume that any juror not satisfied beyond a reasonable doubt that Appellant was guilty under the instruction would have so voted." *Owens v. Commonwealth*, 329 S.W.3d 307, 315 (Ky. 2011). The first instruction for intentional murder required the jury to determine, beyond a reasonable doubt, that VanWilliams was not acting under the influence of EED. This prong of the instruction also referred the jury to Instruction No. 8 where EED was defined. After the EED prong, the jury was instructed to proceed to Instruction Nos. 1A (self-protection) and 1B (wanton or reckless belief), then to the verdict form for Instruction No. 1. The verdict form clearly states that if the jury found VanWilliams guilty of intentional murder, it should "say so by their verdict and

15

no more." Because the jury found VanWilliams guilty of intentional murder, it had to conclude that he was *not* acting under EED and thus never got to the manslaughter instruction.

Additionally, this Court has held that it is error to require the Commonwealth to prove the presence of EED as an element of first-degree manslaughter. *Baze v. Commonwealth*, 965 S.W.2d 817, 822-34 (Ky. 1997). After *Baze*, this Court held, although in an unpublished opinion, that "[s]ince there was evidence of EED, the murder instruction should have included the absence of EED as an element of murder. The first-degree manslaughter instruction should not have included any discussion of EED, and should instead have merely listed the elements of intentional murder." *Day v. Commonwealth*, 2009-SC-000786-MR, 2011 WL 5878361, at *13 (Ky. Nov. 23, 2011). Therefore, the first-degree manslaughter instruction was proper, and the trial court did not err by leaving out reference to EED.

VanWilliams also argues that the trial court erred in failing to include an EED provision in the presumption of innocence instruction. This part of his alleged jury instruction issue is preserved because defense counsel tendered a presumption of innocence instruction that included EED, and also objected when the trial court declined to give that instruction. "We review a trial court's rulings regarding jury instructions for an abuse of discretion." *Ratliff v.*

16

*Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006).[5] Defense counsel tendered the following instruction:

> If you believe from the evidence beyond a reasonable doubt that the Defendant would be guilty of intentional Murder under Instruction __, except that you have a reasonable doubt as to whether at the time he killed Joseph Key, he was or was not acting under the influence of extreme emotional disturbance, you shall not find the Defendant guilty of Murder under Instruction __, but shall find him guilty of First-Degree Manslaughter under Instruction No. __.

The type of instruction tendered by VanWilliams explains the relationship between murder and first-degree manslaughter in a case where EED is at issue. "[S]uch an instruction is required if requested and if warranted by the evidence." *Sherroan v. Commonwealth*, 142 S.W.3d 7, 23 (Ky. 2004). The trial court's instruction on the presumption of innocence contained no reference to EED.

However, having reviewed the record, we cannot say that an EED instruction was even warranted by the evidence. The trial court decided to instruct on EED, noting that it found such an instruction appropriate "by the thinnest of margins." We are constrained to find sufficient proof that would support an EED instruction in this case.

---

[5] "When the question is whether a trial court erred by: (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015). However, because "the trial court has no discretion to give an instruction that misrepresents the applicable law" the content of jury instructions is reviewed *de novo*. *Id.* at 204.

EED is defined by this Court as follows:

> Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefore, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*McClellan v. Commonwealth,* 715 S.W.2d 464, 468-69 (Ky. 1986). Additionally, EED requires a "triggering event." *Spears v. Commonwealth,* 30 S.W.3d 152, 155 (Ky. 2000). VanWilliams testified that he "felt tension building" and that Key lunged for the gun. There was no evidence that Key had a gun himself, only VanWilliams's testimony that Key might have gotten his hands on VanWilliams's gun at some point. He also testified that he feared for his life and felt that if he had not regained control of the gun he would have been killed. The trial testimony supported a self-defense instruction, which VanWilliams received, but did not merit an EED instruction. A struggle for a gun, with the defendant reporting "tension" and "fear" does not equate, absent other proof, with EED.

It is possible that additional evidence could have supported an instruction on self-defense and also EED. In *Thomas v. Commonwealth,* 170 S.W.3d 343, 346 (Ky. 2005), Thomas argued on appeal that the trial court erred in failing to instruct the jury on EED. After Thomas was beaten by two people, suffering multiple fractures of his face and injuries to several teeth, he

18

shot his assailants because he feared they were going to kill him. *Id.* at 346,

350. This Court determined that

> [s]elf-protection and emotional disturbance are separate
> defenses and the presence of the former does not
> automatically trigger the latter, *although under certain
> circumstances and with certain evidence, both might well be
> justified.* Said another way, the mere fact that a defendant
> claims to have acted in self-defense does not mean that he
> was acting under the influence of EED, *i.e.,* that his state of
> mind was necessarily so enraged, inflamed, or disturbed as
> to overcome his judgment, and to cause him to act
> uncontrollably from the impelling force of the extreme
> emotional disturbance.

*Id.* at 349. This Court held that Thomas was entitled to an EED instruction

because

> the jury could have believed, as they obviously did, that [Thomas]
> was not entitled to use deadly physical force against two unarmed
> men, but also have believed he acted in enraged retaliation for the
> beating the victims had already inflicted on him, thereby shooting
> them while under the influence of EED.

*Id.* at 350. Additionally, Thomas had previously been mugged in another state,

resulting in serious injuries to his face, which the Court stated was relevant to

whether "there was a reasonable justification or excuse under the

circumstances as he believed them to be." *Id.*

Although there are factual scenarios where both self-defense and EED

instructions are warranted, the necessary facts are not present here. "While

what constitutes the triggering event may be broadly construed, its impact on

the defendant is not. The event must be so dramatic as to render the mind

temporarily uncontrollable and provoke an explosion of violence." *Luna v.

Commonwealth,* 460 S.W.3d 851, 883 (Ky. 2015). Here there was no evidence

19

constituting an "explosion of violence" nor was there an indication that VanWilliams was unable to control his conduct. The only insight VanWilliams provided as to his state of mind was that he feared for his life and thought Key was going to kill him. While this evidence supports a self-defense instruction, it does not support an EED instruction. In any event, the jury was properly instructed on the definition of EED, as well as the elements of murder in the absence of EED and first-degree manslaughter. If the jury had believed VanWilliams acted under EED, they would not have found him guilty of intentional murder beyond a reasonable doubt, as required by the first jury instruction.

## IV. The trial court's penalty phase instructions were proper.

During the penalty phase, the jury was given four sentencing options: two non-aggravated sentences (term of years and life sentence) and two aggravated sentences (life without possibility of parole until a minimum of 25 years served and life without parole). The only aggravating circumstance provided in the instructions required the jury to find that VanWilliams murdered Key during the commission of a first-degree robbery. The instructions state that the jury can only fix a punishment of either of the life sentences if they are satisfied beyond a reasonable doubt that the aggravating circumstance is true in its entirety. Further, the trial court gave a reasonable doubt instruction that instructed the jury if there was reasonable doubt as to the aggravating circumstance it should not make a finding with respect to it.

VanWilliams argues that the penalty phase instructions were improper. More specifically, he argues that the instructions erroneously failed to direct the jury that even if it found the existence of the lone aggravating circumstance in the instructions that it could still sentence him to a non-aggravated sentence. He states that "the jury did not have a mechanism by which to apply the possible non-aggravated sentences of 20-50 years or life" to this case. Defense counsel objected to the penalty phase instructions, thereby preserving this issue for review. "We review a trial court's rulings regarding jury instructions for an abuse of discretion." *Ratliff*, 194 S.W.3d at 274.[6]

The jury had previously found VanWilliams guilty of first-degree robbery, which resulted in a straight-forward penalty phase. There was nothing in the penalty phase instructions that restricted the jury's ability to impose either of the two non-aggravated penalties, even if it found the aggravating circumstance to be true. Additionally, during his closing argument, VanWilliams's counsel even acknowledged his certainty that the jury would find the existence of the aggravating circumstance but asked that the jury still consider the full range of penalties. Because the jury instructions adequately indicated the full range of sentencing options, we do not find that the trial court abused its discretion.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the Jefferson Circuit Court.

All sitting. All concur.

---

[6] *See* n.5, *supra.*

21

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jeffrey Allan Cross
Assistant Attorney General
Office of Criminal Appeals